[S.F. No. 24403. Nov. 1, 1982.]

EDMUND G. BROWN, JR., as Governor, etc., et al., Petitioners, v. THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent; THOMAS W. MARTIN et al., Real Parties in Interest.

[S.F. No. 24405. Nov. 1, 1982.]

RALPH J. GAMPELL, as Administrative Director, etc., Petitioner, v. THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent; THOMAS W. MARTIN et al., Real Parties in Interest.

244

George Deukmejian, Attorney General, Richard D. Martland, Assistant Attorney General, Arne Werchick and Werchick & Werchick for Petitioners.

No appearance for Respondent.

Leonard M. Friedman, Andrea M. Miller, Kronick, Moskovitz, Tiedmann & Girard, Paul R. Haerle, Vaughn R. Walker, James P. Hargarten, Bruce A. Ericson and Douglas P. Kight for Real Parties in Interest.

Hufstedler, Miller, Carlson & Beardsley, Robert S. Thompson and Mary E. Healy as Amici Curiae on behalf of Respondent and Real Parties in Interest.

## OPINION

**NEWMAN, J.**—The Court of Appeal system in California was expanded significantly by a statute the Legislature passed and the Governor approved during September 1981. The statute went into effect on January 1, 1982. (Stats. 1981, ch. 959.)

On February 26, 1982, via permanent injunction, Judge Fogerty—sitting by assignment on the Sacramento Superior Court—held the statute unconstitutional. He ordered that (1) the Governor refrain from appointing new judges, (2) the Controller refrain from disbursing funds for carrying out the statutory scheme, and (3) the Administrative Director of the Courts refrain from allocating appropriated moneys for that purpose.

The question now is whether we should vacate that injunction. The challenged statute (ch. 959) in its six sections:

1. Adds a fifth division of three judges to the First Appellate District in San Francisco.

2. Adds sixth and seventh divisions of three judges to the Second Appellate District. One new division is in Los Angeles; the other, in Santa Barbara.

3. Adds a third division of four judges to the Fourth Appellate District. The number of judges in the first division, at San Diego, is increased from five to six; at San Bernardino in the second division the number is decreased from five to four. The judges of the new third division are to sit in Orange County.

4. Adds two judges to the Fifth Appellate District in Fresno.

5. Creates a three-judge Sixth Appellate District in San Jose.

6. Declares that money for the Orange County division's judges and staff is to come from existing resources and the 1981 Budget Act, articulates a legislative intent that financing of that division's library and equipment "be achieved by local funding or public or private donation," and proscribes the use of other funds for the library and equipment.[1]

The Legislature's power to enact the first five sections has not been challenged because article VI, section 3 of the California Constitution provides: "The Legislature shall divide the State into districts each containing a court of appeal with one or more divisions. Each division consists of a presiding justice and 2 or more associate justices . . . ." During the proceedings below, however, Judge Fogerty concluded that chapter 959's section 6 (see our fn. 1) was unconstitutional.

HOW THIS CASE AROSE

In December 1981 Thomas Martin and Thomas Tweedy, taxpayers (and real parties in interest here), sued and in an amended complaint filed on December 29 advanced arguments to support their request that implementation of chapter 959 be enjoined. Judge Fogerty in his order of February 26, 1982, recites: "The cause was submitted upon the pleadings, upon judicial notice imparted by documents placed in the record and upon the transcribed oral arguments of counsel. The Court has concluded (1) that there is no question of fact before the Court; (2) that Chapter 959, California Statutes of 1981, is unconstitutional and void."

---

[1] Unlike the other sections of chapter 959, which are incorporated into the Government Code, *the funding restriction is uncodified.* It appears in section 6, which reads: "It is the intent of the Legislature that funding for the library and equipment for the division of the Fourth Appellate District holding sessions in Orange County shall be achieved by local funding or public or private donation. Funds from other sources may not be spent for those purposes. [¶] It is the further intent of the Legislature that funding for support staff be provided from existing resources, and that funding for the four judges of the third division of the Fourth Appellate District is provided in the Budget Act."

In S.F. No. 24403 here the petitioners are the Governor and the Controller. In S.F. 24405 the petitioner is the Administrative Officer of the Courts. They seek mandate to compel respondent court to vacate the injunction.

### The Basis of the Injunction

Judge Fogerty's opinion, dated February 17, 1982, reads in part as follows: "A Court clearly cannot function without a library or equipment. Nor should the Court be in a position where it must solicit and accept donations, whether public or private. [¶] The concept of a tripartite government with its doctrine of separation of powers has been violated by this legislative enactment [chapter 959]. The independence of the judiciary is sacrosanct. . . . [Citation.] [¶] The legislature, through its enactment, has impinged upon the efficient operation of the court, and has thereby violated Article 3, Section 3 of the California Constitution. Furthermore, a statute which requires a state court to finance its necessary operations from donations threatens the integrity of the judicial process and the reputation for impartiality which is indispensible to the judicial functions. [¶] Finally, this Court concludes that the unconstitutional funding provisions cannot be severed from the statute as a whole. . . . It would . . . be beyond the jurisdiction of this Court to attempt to rewrite the statute to determine which of the new divisions would stand or fall. Nor can this Court merely strike the limitation thereby requiring the State to fund a program where an insufficient budget has been allocated. [¶] . . . [T]his Court can review and act only on what is before it. The fact that in the future the legislature may be able to rewrite the statute to then make it constitutional is not a factor to be considered by this Court."

On June 30 this year, perhaps in response to Judge Fogerty's concerns, the Legislature included the following provision in its 1982 Budget Act (Stats. 1982, ch. 326, item 0250-490, provision 2): "Notwithstanding Section 6 of Chapter 959 [see fn. 1, *ante*] . . . $209,480 . . . is expressly allocated to fund the library and equipment for Division Three of the Fourth Appellate District (the division holding sessions in Orange County)."[2] That is to say, *no longer*

---

[2]Item 0250-490 provides:

"—Reappropriation, Judiciary. Notwithstanding any other provision of law, the unencumbered balances, on the effective date of this act, of the appropriations provided in the following citations, are reappropriated for the following purposes and shall be available for expenditure until June 30, 1983.

"001—General Fund

"(a) Item 025-001-001, Budget Act of 1981-for transfer to Item 0250-001-001, to be used for purchase of equipment and basic reference materials for a central law library, not to exceed $719,211.

"Provisions:

"1. Of the amount reappropriated in category (a), $509,731 is appropriated for equipment and shall be available for expenditure only if such expenditure is not in violation of the present injunction relating to Chapter 959, Statutes of 1981, and if these funds are not expended during

*was there any intent that financing of that library and equipment "be achieved by local funding or public or private donation . . . ."*

Thus it appears that the Fogerty injunction, challenged here, reflected the judge's concerns regarding a statutory restriction that no longer exists. Deemed temporary when enacted (see fn. 1, *ante*), that restriction in toto was superseded by the 1982 Budget Act. So we need not consider whether he correctly concluded that in 1981, because of its section 6, the Legislature passed "a statute which violated the California Constitution . . . ."

He stressed, though, that his ruling was "dispositive without regard to other significant problems raised in this litigation." Therefore we proceed to examine those problems, as they have been identified and discussed in the briefs of the parties and amici and during oral argument.

## OTHER SIGNIFICANT ISSUES

Article XVI, section 7 of our state's Constitution prescribes: "Money may be drawn from the Treasury only through appropriation made by law . . . ." For fiscal year 1982-1983 the Legislature has appropriated $36,015,838 "[f]or support of Judiciary, Judicial Council" including specifically $20,964,632 for the Courts of Appeal. Further, the *"amounts appropriated . . . are intended to fully fund all of the judgeships and places of sitting created by Chapter 959 of the Statutes of 1981."* (Italics added.)[3]

---

the 1981-82 fiscal year for these purposes.

"2. Notwithstanding Section 6 of Chapter 959 of the Statutes of 1981, $209,480 of the amount reappropriated in category (a) for the Judicial Council is expressly allocated to fund the library and equipment for Division Three of the Fourth Appellate District (the division holding sessions in Orange County).

"3. The Judicial Council shall submit to the Department of Finance and the Public Works Board a revised plan to correspond with modified space needs for judges and related staff in San Bernardino and San Diego and shall indicate any savings that may be produced from this revision."

[3]Item 0250-001-001 of chapter 326 of Statutes of 1982 provides:

| | |
|---|---:|
| "—For support of Judiciary, Judicial Council | 36,015,838 |
| "Schedule: | |
| "(a) 10-Supreme Court | 5,143,000 |
| "(b) 20-Courts of Appeal | 20,964,632 |
| "(c) 30-Judicial Council | 11,633,899 |
| "(d) 40-Commission on Judicial Performance | 276,000 |
| "(e) 97.20—Unallocated reduction | −1,282,482 |
| "(f) Amount payable from Item 025-001-001, Budget Act of 1981, reappropriated by Item 0250-490 | −719,211 |

"Provisions:

"1. Notwithstanding Section 27.00 of this act, the funds appropriated or scheduled in this item may be allocated or reallocated among categories by order of the Judicial Council subject to being reported to the Director of Finance.

"2. The amounts appropriated by this item are intended to fully fund all of the judgeships and places of sitting created by Chapter 959 of the Statutes of 1981."

Notwithstanding that brief but unambiguous legislative pronouncement, real parties contend that no such funds have legally been appropriated and that the superior court's injunction accordingly should stay in effect.

Why might the pertinent 1982-1983 appropriation be invalid? Because, say real parties, chapter 959 either was void *ab initio* or become void on January 1, 1982, its effective date. We discuss first the latter contention.

It is conceded in this case that real parties' complaint would have been groundless if chapter 959's effective date had been July 1, 1982. But the Legislature's choice of January 1 instead of July 1, it is argued, was fatal since on that day the Governor, the Controller, and the courts' Administrative Director were endowed with powers they could not exercise because, allegedly, the Legislature had provided no money.

Real parties cite no precedents. They maintain, though, that their view is supported by article IV, section 12 of the Constitution and, particularly, by the pronouncement in section 12, subdivision (d) that "[a]ppropriations . . . are void unless passed in each house by rollcall vote . . . two thirds of the membership concurring." Chapter 959 did not receive a two-thirds vote.[4]

Nowhere in the words of the Constitution or in California legislative annals or in juridical opinions can we discover any overriding rule that the Legislature may not, without funding the initial fiscal year, create agencies or offices, including courts and judgeships. On the contrary, in this century the remarkable, nationwide development of budgeting-and-appropriating powers evidences a basic concern that laws which "authorize" be distinguished from those which "appropriate." Legislatures first decide whether a need for a new agency or office seems established; they then decide whether and how to prescribe the funding.

During the first half of this year none of the chapter 959 judgeships was filled, and no new court was inaugurated. As of July 1, though, funding that indisputably meets the constitutional tests of adequacy had been provided.[5] Whatever might have been a problem had the Governor, the Con-

---

[4] In dealing with real parties' contentions we assume, without necessarily accepting, their premise that courts may examine votes recorded in the legislative journals to ascertain whether an enrolled bill approved by the Governor and deposited with the Secretary of State is effective as a statute. In *County of Yolo* v. *Colgan* (1901) 132 Cal. 265 [64 P. 403] this court rejected a claim that a statute was invalid despite a showing that the journal of the Senate recorded less than a majority of its membership as having voted for the bill. Since we uphold the statutes now before us, we need not decide whether *Colgan* should be applied. (See Linde et al., Legislative and Administrative Processes (2d ed. 1981) pp. 113-122 ["Consequences of non-compliance with legislative procedure"].)

[5] Funding of courts by legislative appropriation must not be so inadequate as materially to impair their exercise of constitutional functions. (*Millholen* v. *Riley* (1930) 211 Cal. 29, 34 [293 P. 69].)

troller, or the courts' Administrative Director taken action during the first six months, in fact they took no action. As of now, no longer is there a problem. Pursuant to article VI, section 3 (quoted above), once again the Legislature (via ch. 959) has "divide[d] the State into districts each containing a court of appeal with one or more divisions . . . consist[ing] of a presiding justice and 2 or more associate justices." Further, pursuant to section 12, subdivision (c) of article IV the 1982 Budget Act "fully fund[s] all of the judgeships and places of sitting created by Chapter 959" (see fn. 3, *ante*). Nothing else is required.

The suggestion that chapter 959 was void *ab initio* (i.e., from its date of enactment) is based on the clause in article IV, section 12, subdivision (d) that provides: "Appropriations . . . are void unless passed in each house by rollcall vote . . . two thirds of the membership concurring." Real parties argue that chapter 959, passed by less than a two-thirds vote, contained implied appropriations and that thus the whole chapter is void.

The only reference to money in chapter 959, however, appears in its section 6, the Orange County library-and-equipment clause. We concluded above that the restrictions there were superseded by the 1982 Budget Act. No words in chapter 959 curtail a subsequently created authority to make expenditures from current appropriations. Section 6 itself dealt only with the 1981-1982 budget; it stressed that "funding for [Orange County] support staff [should] be provided from existing resources, and funding for the four judges . . . is provided in the [1981] Budget Act."

Nonetheless as to judges, it is argued, the separation of powers doctrine commands that—once appointed—judges are entitled to their salaries. (Cf. fn. 5, *ante*.) Again we stress that no chapter 959 judges have been appointed. If any had been, though, it appears that a claim for salary would have involved not only chapter 959 but also Government Code section 68200 et seq., which fix base salaries for all Supreme Court and Court of Appeal justices and judges in trial courts of record. Those Government Code sections apparently were approved by vote of 25 Senators, 2 short of the two-thirds required for appropriation bills. (Stats. 1976, ch. 1183, §§ 1-3 (Assem. Bill No. 3844); 9 Sen. J. (1975-1976 Reg. Sess.) p. 16794.) Yet clearly those sections and like laws are valid. Thus, even were it regarded as a law that sets judges' salaries, chapter 959 did not need a two-thirds vote.[6]

---

[6]Real parties invoke the declaration in article III, section 4, subdivision (a) that laws setting the salaries of elected state officers are appropriations. Summarized, the reasoning is as follows: Appellate judgeships are elective offices. Salaries are set by the Government Code. A law creating a new judgeship (such as ch. 959 here) "is the last operative event triggering the Controller's authority to draw salary warrants" for the new judge. "As an operative appropriation, such a law is subject to the two-thirds vote requirement."

The aim of the declaration in article III, section 4, subdivision (a), however, was not to require a two-thirds vote but rather to ordain that even with a mere majority vote certain salary laws are "appropriations." The critical words were in Proposition 6 adopted by the voters at the November 1972 election. In the voters' pamphlet the Legislative Counsel explained that the

Real parties urge that "a proposal establishing a new state agency and appropriating its initial support funds entails not only an appropriation 'for the ensuing fiscal year' within the meaning of Art. IV, sec. 12, subd. (a), but also for an indeterminate number of fiscal years thereafter." Without further legislative action, though, even special appropriations for starting a new agency would not fund its operation in later years. Moreover, no clause in the Constitution extends to laws that create new agencies or offices the two-thirds requirement the people have prescribed for appropriations (art. IV, § 12, subd. (d)), urgency statutes (art. IV, § 8, subd. (d)), and a limited listing of certain laws on taxation and other matters (e.g., art. XIII A, § 3; art. IV, § 4). Absent such a clause, the obvious implication is that agency- and office-creating statutes indeed may be passed by simple majority, separately from whatever budget or appropriation act is needed for implementation.

Real parties suggest that the initial costs of an agency are not "usual current expenses" to which budget acts assertedly are confined. (See Const., art. IV, § 8, subd. (c)(2) (appropriations for usual current expenses take immediate effect); *McClure* v. *Nye* (1913) 22 Cal.App. 248 [133 P. 1145] (appropriations to construct buildings were not for usual current expenses and did not take immediate effect).) Yet the budget bill must itemize "expenditures" (art. IV, § 12, subd. (c)), including capital outlays, whether or not they are usual and current. And both the 1981 and the 1982 Budget Acts include urgency clauses, seemingly to assure their taking immediate effect without reliance on the "usual current expenses" reference in article IV, section 8, subdivision (c)(2). (See Stats. 1981, ch. 99, § 36.00; Stats. 1982, ch. 326, § 36.00.)

Petitioners cite a precedent for creating appellate judgeships by a statute that specifies no appropriation for their support. Item 17 of the 1973 Budget Act (Stats. 1973, ch. 129) appropriated a lump sum for appellate courts and added a proviso "that $72,000 of the funds appropriated in this item shall not be expended unless legislation is enacted during the 1973-74 Regular Session establishing an additional judgeship for the Third Appellate District." When that law was enacted Government Code section 69103 declared, "The Court of Appeal for the Third Appellate District consists of one division having four judges and shall hold its regular sessions at Sacramento." Later, on October 2, 1973, section 69103 was amended to provide that, until January 15, 1975, the Third Appellate District should have six judges and, on and after that date, seven. (Stats. 1973, ch. 1124.) Section 4 of the amending chapter provided "Notwithstanding the provisions of Item 17 of the Budget Act of 1973, the seventy-two thousand dollars ($72,000) reserved by that item for an additional

---

words "would eliminate the existing requirement that there be a specific appropriation enacted in the Budget Act, *or otherwise,* to pay salaries." (Italics added.) In other words, though a bill setting salaries of elected state officers is not an appropriation bill it nonetheless takes effect as an appropriation once it has been enacted.

judgeship in the Third Appellate District of the Court of Appeal may be expended for more than one additional judgeship for that district."

Is that relaxation of the previously imposed budgetary restriction distinguishable from the legislative history here? We think not, for in 1973 the Legislature patently did not treat chapter 1124 as an appropriation bill. In its final paragraph, the Legislative Counsel's Digest of the last-amended version of Senate Bill No. 1149 (which became ch. 1124) reads: "*Vote: majority. Appropriation: no.* Fiscal committee: yes. . . ." (Italics added.) Though chapter 1124 in fact passed both houses with more than a two-thirds vote (see 5 Assem.J. (1973 Reg. Sess.) p. 8880; 4 Sen.J. (1973 Reg. Sess.) pp. 6754-6755), that digest reflects the Legislative Counsel's opinion that the bill contained no appropriation. The Legislature's creation—with no contemporaneous appropriation—of three new judgeships in 1973 (ch. 1124) and many new judgeships and appellate courts in 1981 (ch. 959) raises a "strong presumption" that accompanying appropriations were not constitutionally required. (See *Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d 161] (referring to a "settled principle of construction, i.e., the strong presumption in favor of the Legislature's interpretation of a provision of the Constitution"); cf. *San Jose Mercury-News* v. *Municipal Court* (1982) 30 Cal.3d 498, 514 [179 Cal.Rptr. 772, 638 P.2d 655].)

Finally, by our clerk's letter of July 8, 1982, real parties were invited to comment on the effect of the 1982 Budget Act in this case. In response they have argued that the absence of appropriations in chapter 959 and a claimed absence of appropriations for new judgeships and courts in the 1981 Budget Act made that chapter void *ab initio,* incapable of being revived by the 1982 Budget Act. They invoke the principle that "[a]n act of the legislature which is in conflict with the constitution is no statute at all." (*Reclamation District* v. *Superior Court* (1916) 171 Cal. 672, 676 [154 P. 845]; see *Norton* v. *Shelby County* (1886) 118 U.S. 425, 442 [30 L.Ed. 178, 186, 6 S.Ct. 1121].)

They concede exceptions to the principle, and properly they note the inapplicability here of one exception: the giving of limited effect to a void statute in order to protect rights created by innocent reliance on its validity. (See *Chicot County Dist.* v. *Bank* (1940) 308 U.S. 371, 374 [84 L.Ed. 329, 332-333, 60 S.Ct. 317].) Rights have not intervened here because the new divisions are not now established, the new judgeships not yet filled.

Real parties then identify, but puzzlingly fail to discuss, another exception: "[A] partially invalid statute may be validated by later legislation." That exception applies here. Real parties concede, for instance, that the 1982 Budget Act validly superseded chapter 959's section 6 (see above). Why then would the first five sections still be invalid? Not because of what those sections say, it is

argued, but because of what they fail to say; namely, that funds are available for spending.

We hold that the 1982 Budget Act cures the alleged omission and renders the chapter fully operative. In point is *County of Los Angeles* v. *Jones* (1936) 6 Cal.2d 695 [59 P.2d 489], for example, where the Legislature enacted amendments (Stats. 1935, ch. 729, p. 1999) to sections of the Assessment Bond Refunding Act of 1933 (Stats. 1933, ch. 749, p. 1915) in response to a decision holding the act unconstitutional (*County of Los Angeles* v. *Rockhold* (1935) 3 Cal.2d 192 [44 P.2d 340, 100 A.L.R. 149]). Ruling the amendments valid, this court rejected the contention that they were void simply because the law they modified had been declared unconstitutional. (*County of Los Angeles* v. *Jones, supra,* 6 Cal.2d at p. 708.)[7]

## CONCLUSION

Chapter 959 was a proper exercise of the Legislature's power to establish additional courts of appeal and judgeships. We need not decide whether judgeships could have been filled or courts started up before passage of the 1982 Budget Act. That act now has become law, and implementation of chapter 959 thus is lawful.

Let a peremptory writ issue, ordering respondent to vacate its judgment against petitioners and to enter judgment against real parties in interest.

Reynoso, Acting C. J., Brown (Gerald), J.,* and White, J.,* concurred.

**RICHARDSON, J.**—I respectfully dissent.

The statute at issue herein (Stats. 1981, ch. 959), enacted in September 1981, was to become effective on January 1, 1982. Although chapter 959 purported to

---

[7]The dissent argues that it was "improper" to appropriate funds for judgeships not yet approved (*post,* p. 253), that the "proper" procedure is to include special appropriations for new projects in the legislation establishing them (*post,* p. 254), and that "sound public policy" calls for judicial creation of a "prophylactic rule" that statutes such as chapter 959 are absolutely void unless adopted by a two-thirds vote (*post,* pp. 254, 255).

It is not this court's function to adjudge the propriety of legislative processes that violate neither the California nor the federal Constitution. As a "coordinate branch of our state government" our Legislature is "entitled to function within its domain without interference by the courts," and the judicial role does not include an inquiry whether that functioning can be reconciled with "sound public policy." (*Santa Clara County* v. *Superior Court* (1949) 33 Cal.2d 552, 556 [203 P.2d 1]; see *Taylor* v. *Cole* (1927) 201 Cal. 327, 332-338 [257 P. 40].) Accordingly, we rule only that there is no constitutional defect in Chapter 959 and the related provisions of the 1982 Budget Act.

*Assigned by the Acting Chairperson of the Judicial Council.

establish 18 new appellate judgeships on that date, no valid prior appropriation of funds had been made to pay for them. Accordingly, chapter 959 itself constituted, in legal effect, an attempted implied appropriation measure which was rendered absolutely void for failure to obtain the requisite two-thirds vote needed to adopt such a measure (Cal. Const., art. IV, § 12, subd. (d)). Being void in its entirety on January 1, 1982, chapter 959 could not be revived by a belated appropriation contained in the 1982-1983 Budget Act (Stats. 1982, ch. 326).

1. *No Valid Prior Appropriation in the 1981-1982 Budget Act.*

Initially, it is clear that there existed no *prior* appropriation of funds legally available to pay the costs of chapter 959's ambitious programs. The 1981-1982 Budget Act (Stats. 1981, ch. 99) contained a lump sum appropriation of $19,321,447 for the Court of Appeal, and there is some indication that this figure was intended to include some provision for *15* new judgeships which were proposed under an earlier, vastly different, version of the bill which ultimately became chapter 959. (See 1981-1982 Governor's Budget, at p. LJE 10.) Yet, as I explain, we could not properly hold that the 1981-1982 Budget Act lawfully appropriated funds for the 18 judgeships created by chapter 959. Indeed, the majority herein does not contend otherwise.

There are several reasons for the foregoing conclusion. First, as the budget act itself acknowledged, the act's various appropriations were limited to "the usual current expenses" of the state. (Stats. 1981, ch. 99, § 35.00; see Cal. Const., art. IV, § 8, subd. (c)(2).) Although such expenses could legitimately include anticipated expenditures for previously authorized projects, or programs not requiring legislative approval, nevertheless, as the state Legislative Analyst pointedly observed, it was improper to provide an appropriation in the budget act for future judicial positions which had not yet been legislatively approved. Instead, the funding of such new positions should have been considered "in connection with the authorizing legislation," i.e., chapter 959. (Legis. Analyst Rep. to Joint Legislative Budget Com., Analysis of 1981-1982 Budget Bill, at p. 8.)

The practical reason for excluding from a budget act any appropriations for items which are not as yet legislatively authorized is obvious: An annual budget act is intended to itemize the probable recommended state expenditures for the forthcoming fiscal year. (Cal. Const., art. IV, § 12, subds. (a), (c).) Until formal enabling legislation is enacted, following the usual procedures of hearings and debates, the necessity for an appropriation for such an item is entirely speculative and premature.

In the present case, therefore, the lump sum appropriation for the Court of Appeal in the 1981-1982 Budget Act was not lawfully available to fund the 18

added judgeships subsequently created by chapter 959. Any different conclusion could readily endanger the financial security of the state by permitting the use of general funds to defray the cost of projects which were neither anticipated nor authorized at the time when the state's forthcoming budget needs were calculated. As we recently held, appropriated funds may be spent *only* for the particular purpose for which they were legislatively designated. (*Stanson* v. *Mott* (1976) 17 Cal.3d 206, 213 [130 Cal.Rptr. 697, 55, P.2d 1].)

## 2. *No Valid Appropriation in Chapter 959.*

I do not suggest, of course, that the Legislature is powerless to approve and fund new projects not properly included in the current budget bill. However, the proper procedure, as carefully explained in the report of the Legislative Analyst, previously quoted, is to appropriate specially those funds for such projects as part of the legislation which establishes the projects. (See Cal. Const., art. IV, § 12, subd. (d).) No such special appropriation was contained in chapter 959, of course. If an *implied* appropriation was intended, the measure necessarily failed because, as the majority concedes, chapter 959 did not gain the constitutionally mandated two-thirds legislative approval.

## 3. *No Valid Appropriation in the 1982-1983 Budget Act.*

The majority insists that any defect in appropriating funds for the judgeships created by chapter 959 was cured by a subsequent appropriation contained in the 1982-1983 Budget Act (Stats. 1982, ch. 326), which was adopted by the Legislature on June 30, 1982. Because chapter 959 was absolutely *void* as of January 1, 1982, however, no such revival or cure could have occurred. Sound public policy compels that conclusion.

As previously indicated, by its terms chapter 959 supposedly became effective on January 1, 1982, despite the lack of any funds legally available to pay the salaries and expenses of the 18 new judgeships created by that chapter. If we assume that chapter 959 was nonetheless a valid and effective measure on January 1, 1982, the Governor thereupon became authorized and, indeed, was constitutionally mandated (Cal. Const., art. VI, § 16, subd. (d)) to appoint 18 new judges to fill those positions. Any such appointments automatically, and without the necessity of any further proceedings, would have imposed upon the state a corresponding *liability* to pay the salaries statutorily prescribed for the new offices. (See Gov. Code, §§ 68201, subd. (b); 68203.) As the Constitution provides, "Laws that set these salaries [of elected state officers such as judges] are appropriations." (Cal. Const., art. III, § 4, subd. (a); see *Olson* v. *Cory* (1980) 27 Cal.3d 532, 543-544 [178 Cal.Rptr. 568, 636 P.2d 532].)

Thus, assuming that chapter 959 became effective on January 1, it thereupon had the immediate potential of imposing upon the General Fund a substantial liability not secured by any valid preexisting appropriation. Attempting to salvage chapter 959, the majority in hindsight observes, however, that "no chapter 959 judges have been appointed" (*ante,* p. 249), evidently acknowledging that had such appointments been made prior to the passage of the 1982-1983 Budget Act, a different result might obtain. Yet it should be wholly irrelevant from a constitutional standpoint that *in this case* no appointments were made. In *every case* it is the *potential* liability of the General Fund which requires a two-thirds approval of the Legislature before special appropriation measures such as chapter 959 may be adopted. To assure that no such future liability is incurred or attempted, this court should recognize a prophylactic rule that all similar measures are absolutely void unless adopted by the requisite two-thirds vote. Such proposals may not be somehow frozen in a legislative refrigerator and later thawed by a belated appropriation in some *subsequent* budget act.

While ineffective for funding the new judgeships, the 1982-1983 Budget Act is revealing in one important respect: In attempting to provide a belated appropriation for "all of the judgeships and places of sitting created by Chapter 959 of the Statutes of 1981" (Stats. 1982, ch. 326, item 0250-001-001), the Legislature thereby impliedly acknowledged that no *prior* valid appropriation had theretofore been made for this item. Yet being absolutely void, chapter 959 and the 18 judgeships could not be so readily created by only the briefest reference in a single item in the budget act. Under our system of government, revival of a void act can only occur by a *reenactment* of the legislation following the usual legislative process and its accompanying safeguards against precipitous action. That essential procedure was not followed here.

The majority seeks help from a principle that a *partially* invalid statute may be validated by later legislation. (*Ante,* p. 251.) Yet as I have explained, chapter 959 was entirely void, not partially so, having failed to gain the necessary two-thirds legislative approval of the attempted appropriation implicit within chapter 959's provisions.

Nor is *County of Los Angeles* v. *Jones* (1936) 6 Cal.2d 695, 708 [59 P.2d 489], in point. There we held that the Legislature could amend an unconstitutional law by a subsequent *duly enacted* amendment. As noted, chapter 959 was not reenacted in the manner required by law; moreover, *Jones* did not purport to allow *revival* of the entire void act by a simple amendment thereto.

Finally, the majority points to the fact that, on a prior occasion, the Legislature purported to create new appellate judgeships for the Third Appellate District without *expressly* appropriating funds for their support. (*Ante,* pp. 250-251.) Yet, as the majority must concede, the legislation there at issue

"in fact passed both houses with more than a two-thirds vote . . . ." (*Id.*, at p. 251.) Thus, although the Legislature did not label it as such, the Third District legislation clearly constituted an *implied* appropriation which was duly approved by the requisite vote.

To summarize, the constitutional invalidity of chapter 959 is founded upon more than mere empty technicalities which govern the adoption or amendment of legislation. Legislation which potentially creates a new and unappropriated state liability constitutes an implied appropriation. Every such appropriation must be approved by a two-thirds vote of the Legislature. This principle rests upon the sound financial policy which underlies article IV, section 12, subdivision (d), of the California Constitution. As California's highest court it is our clear duty to remain ever diligent to protect the state treasury against unauthorized invasions from any source. It is our function, particularly, to insist upon that full and strict compliance with those constitutional safeguards which the people themselves have imposed upon the appropriation process. In my view, chapter 959 is invalid because of its noncompliance with article IV, section 12, subdivision (d) of the California Constitution. It follows from this that no new appellate judgeships were created.

I would deny the peremptory writ.

Caldecott, J.,* and Franson, J.,* concurred.

On November 18, 1982, the petition of real party in interest Tweedy for rehearing was denied, at which time the following order of court and dissenting opinion on denial of rehearing were filed. Richardson, J., Caldecott, J.,* and Franson, J.,* were of the opinion that the petition should be granted. A response of Justice Reynoso to that dissenting opinion was filed on January 12, 1983, and is reproduced below.

ORDER OF COURT

SUPREME COURT
FILED
Nov 18 1982
LAURENCE P. GILL, Clerk
Deputy

S.F. No. 24403, 24405

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA
IN BANK

*Assigned by the Acting Chairperson of the Judicial Council.

BROWN, JR., ETC., ET AL., PETITIONERS,

v.

THE SUPERIOR COURT OF SACRAMENTO COUNTY, RESPONDENT;
MARTIN, ET AL., REAL PARTIES IN INTEREST.

....................................................................................

GAMPELL, ETC., PETITIONER,

v.

THE SUPERIOR COURT OF SACRAMENTO COUNTY, RESPONDENT;
MARTIN, ET AL., REAL PARTIES IN INTEREST.

Since the decision in these cases was filed on November 1, 1982, the Court has received and considered the following papers:

1. Stipulation re Finality of Decision, signed November 2, 1982, by attorneys of record for the petitioners and for both real parties in interest, and filed November 3, 1982, stipulating that the decision may become final forthwith.

2. Letter from amici curiae dated November 8, 1982, urging that finality of the decision not be accelerated.

3. Substitution of Attorneys for real party in interest Thomas A. Tweedy, filed November 15, 1982.

4. Motion by real party in interest Tweedy to (1) Strike Stipulation; (2) Extend Time to File Petition for Rehearing; (3) Stay Issuance of Remittitur and Peremptory Writ and (4) Modify Judgment, filed November 15, 1982.

5. Letter from the Attorney General, as counsel for petitioner Edmund G. Brown, Jr., dated November 15, 1982, urging that the decision be made final forthwith notwithstanding the letter from amici curiae and the disavowal by real party in interest Tweedy of the stipulation filed November 3rd.

6. Petition for Rehearing and Motion Pursuant to Rule 45(e) (relief from default) filed by real party in interest Tweedy on November 16, 1982.

7. Opposition of Petitioner Edmund G. Brown, Jr., Governor, to Motion of Thomas A. Tweedy, filed by the Attorney General as counsel for the Governor on November 17, 1982.

In light of the declaration and affidavit attached to the motion of real party in interest Tweedy, the stipulation is stricken as to him. In all other respects, his

motion filed November 15, 1982, is denied. The motion for relief from default, filed November 16, 1982, has been rendered moot by acceptance of the petition for rehearing.

After due consideration, the petition for rehearing is denied. The court deems that this lawsuit has long enough delayed the implementation of responsibilities that our Constitution entrusts to the Legislature. Accordingly, for good cause, the decision herein is made final forthwith.

See dissenting opinion.

Richardson, J., Caldecott, J., and Franson, J., are of the opinion that the petition should be granted.

Reynoso
Acting Chief Justice

**RICHARDSON, J.**—I respectfully dissent from the majority's order summarily denying the timely filed petition for rehearing and making the decision in this case "final forthwith" only two days after that petition was filed. Decisions of our court ordinarily become final "30 days after filing." (Rule 24(a), Cal. Rules of Court.) No valid special considerations, peculiar to this case, justify the majority's deviation from our usual practice of awaiting expiration of the full 30-day period.

There are good reasons for our traditional compliance with the rule. During the rule's 30-day period, we may (and frequently do) receive constructive and useful criticism from the litigants, from the bench, the bar, legal scholars, amici curiae, and from other interested persons. These criticisms or suggestions often may persuade us to grant a rehearing or at least to modify our opinion in various important respects. (See rule 27(a).)

In the present case, although counsel for the respective parties had filed a purported "Stipulation re Finality of Decision" agreeing that our decision may become final forthwith, one of those parties (a real party in interest herein) subsequently and timely moved to strike that stipulation on the basis that he never authorized his counsel to sign it. According to real party's declaration, he has discharged his former attorney, obtained new counsel, and now withdraws the stipulation. In addition, real party has filed a timely petition for rehearing challenging the merits of our decision. Real party's briefs in support of rehearing contain, among other things, two arguments not heretofore considered by this court. First, he notes the failure of the statute at issue herein (Stats. 1981, ch. 959) to comply with the constitutional mandate that the commission con-

firming any appellate court nominations must include a representative of the Court of Appeal (Cal. Const., art. VI, §§ 7, 16, subd. (d)). As real party observes, chapter 959 purported to create a new Sixth District of the Court of Appeal having no preexisting justices qualified to perform such representation.

In addition, the petition for rehearing points out that the 1982-1983 Budget Act has not cured the unconstitutional defect in section 6 of chapter 959, which purports to deprive the new Orange County Division of the Fourth District Court of Appeal of any appropriated public funds to support a library and the equipment essential for the functioning of that new division. As the petition correctly observes, the 1982-1983 Budget Act merely provides a *temporary* funding of such needs that will expire on June 30, 1983.

The various points raised by real party may or may not have merit or justify a rehearing. Unfortunately, despite the timely filing of his petition for such rehearing, the majority has summarily denied that petition without according it the appropriate consideration heretofore given to petitions filed with this court.

The majority's break with tradition does not end there, for it also has ordered its former decision "final forthwith," thereby prematurely terminating our authority (rule 27(a)) to order a rehearing or modification of the opinion *sua sponte*. In addition to the petition for rehearing filed by one of real parties, we have received from amici curiae herein a letter indicating amici's intent to file additional authorities and argument which might induce this court, if reasonable time was afforded, to order a rehearing *sua sponte*. It is most unfortunate that the majority, in its rush, denies amici opportunity, during our rule time, of presenting their additional contentions. The majority's finality order forecloses and summarily rejects amici's presentation without even considering its possible merits, and without explaining why immediate finality is appropriate in this case.

While the majority recites that its order is issued for "good cause," no one has suggested what that "good cause" is. The only document filed in support of the finality order is the now withdrawn stipulation of counsel referred to above, which recites merely that counsel had agreed to finality, without more. What possible emergency exists to justify any deviation from our usual procedures?

Only rarely and under exigent circumstances are we justified in making our decisions "final forthwith." As one distinguished commentator has observed: "If a promptly effective decision is of *vital importance* to the public or to the parties, the Supreme Court may make its judgment 'final forthwith' . . . ." (6 Witkin, Cal. Procedure, Appeal, § 519, at p. 4466, italics added.)

We have used the foregoing power sparingly. For example, we adopted such a procedure in *Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638, 679 [180 Cal.Rptr. 297, 639 P.2d 939], the reapportionment case, so that election officials would know the precise boundary lines in time for the orderly conduct of the June 1982 Primary Election. Similarly, in *Carmel-By-The-Sea* v. *Young* (1970) 2 Cal.3d 259, 272 [85 Cal.Rptr. 1, 466 P.2d 225, 3 A.L.R.3d 1313], our decision to invalidate an extensive financial disclosure law as an unconstitutional breach of privacy was made "final forthwith" to afford immediate relief to candidates and government officials who were subject to that law. We stressed the "exigent circumstances" which required our immediate attention. (P. 263.) No similar urgency or "good cause" justifies immediate finality in the present case.

Charles Evans Hughes left us with a gentle reminder: "There are two things against which a Judge ought to guard, precipitancy and procrastination." This court has not procrastinated in its disposition of this matter, having taken it from the Court of Appeal before which it was pending and having given it expedited hearing. We now are within our rule 24(a) period. Our Court of Appeal has continued to function during this period, and we are told that existing vacancies on the court have been unfilled for months.

In my view, the majority's action is precipitous and unwarranted under the circumstances. There has been no demonstration of any unusual legal necessity which might justify our departure from the traditional, orderly disposition of this appeal. We should not do so for any unspoken reasons.

Caldecott, J.,* and Franson, J.,* concurred.

**REYNOSO, J.**—The dissenting opinion on denial of rehearing requires a response. (See *People* v. *Love* (1961) 56 Cal.2d 720, 756 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].) I cannot be deemed acquiescent to the dissent's view with respect to the procedures used by this court in denying rehearing and making the decision in this case final.

Justices of this court have from time to time dissented to orders denying rehearing to express their views on the merits of the petition for rehearing (see, e.g., *People* v. *Love, supra,* 56 Cal.2d 720, 748; *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 208 [288 P.2d 12, 289 P.2d 242]) or to argue that a modification did not adequately cure the defects of the original opinion (see *Olson* v. *Cory* (1980) 27 Cal.3d 532, 569 [178 Cal.Rptr. 568, 636 P.2d 532]; *Agnew* v. *City of Los Angeles* (1958) 51 Cal.2d 1, 11-12 [330 P.2d 385]). The dissent in this case, however, is not directed to the merits (the points raised ". . . may or

*Assigned by the Acting Chairperson of the Judicial Council.

may not have merit or justify a rehearing" (*ante,* at p. 259)) but, rather, raises questions regarding the procedures used in disposing of the rehearing petition and other filings. A majority of this court did of course decide that the issues raised on rehearing were meritless. Nevertheless, the dissent mistakenly suggests that the petition for rehearing was denied summarily without due consideration of the merits, and that the order making the decision final deviated from the "usual practice."

It is to these implications as to the integrity of the decisionmaking process that my response is directed. This case, being final, is no longer subject to comment on the merits; accordingly, I will limit my response to the collateral, procedural matters raised by the dissent.

This court unquestionably has the power to order its decisions final forthwith. The California Rules of Court provide that the Supreme Court may direct the immediate issuance of a remittitur "For good cause shown, or on stipulation of the parties, . . ." (Rule 25(b).)

Noting that one of the real parties disavowed the stipulation filed in this case, the dissent argues there was no "good cause" to make "this appeal" final, but it concedes that the important issues in this case were given "expedited" review throughout these proceedings. (*Ante,* at p. 260.) With due respect, this case is not the normal "appeal" characterized by the dissent. We treated the appealable judgment in this case as an extraordinary writ proceeding, as is proper in cases where "the public interest requires a more rapid determination of the constitutionality of the . . . statute than can be provided in the normal course of appellate review." (*Brown* v. *Superior Court* (1971) 5 Cal.3d 509, 515 [96 Cal.Rptr. 584, 487 P.2d 1224].) We also determined that this case presented important questions requiring prompt resolution by this court; accordingly, we exercised our original jurisdiction and bypassed Court of Appeal review. (See, e.g., *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 241 [186 Cal.Rptr. 30, 651 P.2d 274]; *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 808-809 [114 Cal.Rptr. 577, 523 P.2d 617].) Further, as in *Brosnahan,* we scheduled a special calendar for oral argument. In short, this court made a determination early on that the issues raised in the present case were of public importance and warranted expedited review; thus, this case began with a need for prompt resolution, and ended as it began.

The foregoing amply demonstrates that the majority's finality order was not motivated by "unspoken" considerations apart from the legal issues. Moreover, in every case we have found on this issue—including the authority cited by the dissent (*Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638 [180 Cal.Rptr. 297, 639 P.2d 939]; *City of Carmel-By-The-Sea* v. *Young* (1970) 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313])—the decision was made

"final forthwith" without explanation. (See also *Corona Unified Hosp. Dist.* v. *Superior Court* (1964) 61 Cal.2d 846, 854 [40 Cal.Rptr. 745, 395 P.2d 817] ["final forthwith" without explanation; appeal inadequate remedy; proceeding in prohibition by taxpayers challenging validity of statute].) Indeed, the cases in which this court has made its decision final forthwith without explanation (but where the urgency was self-evident) are legion—the most recent of the more than 50 such cases being *Brosnahan* v. *Eu* (1982) 31 Cal.3d 1 [181 Cal.Rptr. 100, 641 P.2d 200], *Stanton* v. *Panish* (1980) 28 Cal.3d 107 [167 Cal.Rptr. 584, 615 P.2d 1372], *Chatterton* v. *Eu* (1980) 28 Cal.3d 123 [167 Cal.Rptr. 593, 615 P.2d 1381], *Eu* v. *Chacon* (1976) 16 Cal.3d 465 [128 Cal.Rptr. 1, 546 P.2d 289], *Phelps* v. *Brennan* (1976) 16 Cal.3d 508 [128 Cal.Rptr. 423, 546 P.2d 1367], *Brown* v. *Superior Court* (1975) 15 Cal.3d 52 [123 Cal.Rptr. 377, 538 P.2d 1137].

Nevertheless the dissent inexplicably asserts that the majority has broken tradition in this case. In particular, the dissent looks to the body of the opinion in *Carmel-By-The-Sea* and argues that in that case there were "exigent circumstances" not present here. To the contrary, if one reads the quoted phrase in the context of the whole sentence, it is clear that both *Carmel* and the instant case "presented . . . a question of constitutional magnitude affecting numerous public officials . . . which under exigent circumstances [was] brought to our attention by two public officials . . . ." (*City of Carmel-By-The-Sea, supra,* 2 Cal.3d at p. 263.) In fact the exigency may have even been greater in this case. First, the above-quoted sentence is clearly a response by the *Carmel* majority to the dissent's view, in that case, "that the lawsuit was contrived, that there is no legitimate controversy, [and] that the rights of no individuals are involved. . . ." (*Id.,* at p. 275; Mosk, J., dis.) Secondly, the *Carmel* court held the statute at issue therein unconstitutional, thereby precluding the possibility of enforcement during the 30-day prefinality period. Here, by contrast, the statute was held constitutional and enforceable, as it would have been from its enactment but for this lawsuit which ultimately proved unmeritorious.

It is also significant that the majority's finality order was not filed until after amici curiae's filing and real party's petition for rehearing were considered. With all respect, I must therefore take issue with the dissent's assertion that this court's finality order deprived real party and amici curiae of the opportunity to be heard. A brief chronology of the events following the filing of the decision in this case (see minute order of Nov. 18, 1982, *ante,* at p. 256) will suffice to show the consideration given the dissenting justices and the parties.

On November 3, 1982, two days after this court's decision was filed, the parties of record filed a stipulation, signed by their respective counsel on November 2, that the decision "may become final forthwith." As earlier noted, rule 25(b) provides that the Supreme Court may direct the immediate issuance

of a remittitur "For good cause shown, or on stipulation of the parties, . . ." Both criteria having been met in this case, a majority of this court voted to accept the parties' stipulation.

Though at this point all the parties to this litigation had stipulated to immediate finality, thereby waiving their right to seek either rehearing or a modification of the opinion, the dissenting justice was nevertheless of the view that this court's finality order would preclude consideration of "useful criticism" that might be filed by "the bench, the bar, legal scholars, amici curiae, [or] other interested persons." (*Ante,* at p. 258.) In light of the expedited review heretofore given to the important issues in this case, a majority of the justices were not persuaded that the action urged by the litigants, and agreed to by the court, be delayed on the mere speculative possibility of future filings by nonparties. Due to the delay involved in the preparation of the dissent, our finality order was not ready for filing until November 9, 1982.

On that date we received a letter from amici curiae urging that finality of the decision not be accelerated. Amici curiae—not being parties to the action—have no standing to petition for rehearing (rule 27(a) and (b)) and are bound by the general rule that they must "accept[] the case as [they] find[] it and may not 'launch out upon a juridical expedition of [their] own unrelated to the actual appellate record.'" (*E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 510-511 [146 Cal.Rptr. 614, 579 P.2d 505], quoting *Pratt* v. *Coast Trucking, Inc.* (1964) 228 Cal.App.2d 139, 143 [39 Cal.Rptr. 332].) Nevertheless, this court routinely considers amici curiae briefs suggesting rehearing or modification of the opinion on the court's own motion. In this case, however, amici did not brief a single issue in support of rehearing. The only legal argument alluded to appears in one sentence which states that the finality of decision urged by the parties would preclude amici "from inviting the court's attention to . . . serious long range consequences of the opinion's statement on page 7 to the effect that enactments contained in the statutes at large are 'Deemed temporary when enacted'; . . ." (This argument was later raised in real party's petition for rehearing and was considered by the court.) Amici's letter also expressed the intent to "expand" on this point, presumably in a subsequent filing. (Subsequently, the Attorney General, as counsel for petitioner Brown, filed a response urging the court to issue the peremptory writ forthwith.)

The dissent was redrafted to reflect that the majority's proposed finality order would deny "amici opportunity, during our rule time, of presenting their additional contentions. . ." and "foreclose[] and summarily reject[] amici's presentation without even considering its possible merits, . . ." (*Ante,* at p. 259.) As noted, there were no "contentions" to consider. Moreover, amici never did file "additional" authorities within the time period prescribed by rule

27(b) (which expired Nov. 16, 1982—prior to the filing of our order). Though there is no authority in point, it seems doubtful that amici are entitled to more time than allowed parties under rule 27(b) to request rehearing. Further, this court is not required to (nor does it usually) wait expiration of the full 30-day prefinality period (rule 24(a)) before denying rehearing. Under the dissent's reasoning, amici and other interested persons are deprived of "reasonable time" to request the court to grant rehearing *sua sponte* in every case in which rehearing is denied within the 30-day period.

Following the revision of the dissent, our order was again ready for filing on November 15, 1982. On that date, however, real party Tweedy filed, inter alia, a motion to strike the stipulation and a request for extension of time to file a petition for rehearing.

"A stipulation in proper form is binding upon the parties if it is within the authority of the attorney. (See *Palmer* v. *City of Long Beach,* 33 Cal.2d 134, 141-144 [199 P.2d 952]; *Brock* v. *Superior Court,* 29 Cal.2d 629, 634 [177 P.2d 273, 170 A.L.R. 521].) Unless contrary to law, court rule or public policy, a stipulation is also binding upon the court. (*Capital National Bank* v. *Smith,* 62 Cal.App.2d 328 [144 P.2d 665]; 1 Witkin Cal. Procedure (2d ed. 1970) Attorneys, § 125, p. 138.)" (*Bechtel Corp* v. *Superior Court* (1973) 33 Cal.App.3d 405, 411-412 [109 Cal.Rptr. 138].)

In an affidavit and memorandum attached to the motion to strike, Tweedy declared that his counsel, "acting without [his] knowledge, without his consent, and against his wishes, signed and filed a [stipulation] that purports" to waive his appellate remedies. Without expressing any opinion as to whether Tweedy's showing was sufficient to overcome the "strong presumption" that an attorney acts with authority and within the scope of his employment (1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 108, p. 119)—and without intimating any impropriety on the part of distinguished counsel—we allowed Tweedy to disavow the stipulation in light of his declared intent to file a petition for rehearing "to draw to this Court's attention important issues not considered."

In this regard, Tweedy requested an extension of time until December 15, 1982, to file a petition for rehearing. Yet, he was able to file a petition for rehearing on November 16—the last day before expiration of the normal 15-day period prescribed in rule 27(b). The petition was reviewed by all the justices and, after due consideration, denied.

I must respectfully, but strongly, take issue with the dissent's assertion that "the majority . . . summarily denied that petition without according it the appropriate consideration heretofore given to petitions filed with this court." (*Ante,* at p. 259.) The petition for rehearing was disposed of in accord with the

usual internal practice of this court. (See Cal. Supreme Court Pending Case Service, Special Report, pp. 1001-1004; Oakley & Thompson, Law Clerks and the Judicial Process (1980) pp. 77-82; Goodman & Seaton, *Foreword: Ripe for Decision, Internal Workings and Current Concerns of the California Supreme Court* (1974) 62 Cal.L.Rev. 309, 312-316.) Immediately after filing, the petition was recorded, internally processed, and assigned to a justice's staff for preparation of a memorandum. After a thorough analysis of the issues raised for the first time on petition for hearing (but see *County of Imperial* v. *McDougal* (1977) 19 Cal.3d 505, 513 [138 Cal.Rptr. 472, 564 P.2d 14]) and the contentions regarding alleged defects in our opinion, the memorandum concluded that real party's contentions—new or rehashed—were meritless and did not warrant a rehearing. The memorandum and the petition were distributed to the justices, and a conference was scheduled for the afternoon of November 18. The court, of course, sits in bank to decide matters brought before it. In most matters, this court has full discretion, upon concurrence of at least four justices, to decide whether or not to grant a hearing (or rehearing) in any particular case. (See generally Mosk, *Foreward: The Rule of Four in California* (1975) 63 Cal.L.Rev. 2.) In this case, a majority of the court decided—after consideration of the briefs and discussion of the merits and issues summarized in the conference memorandum—that rehearing should be denied. This is not unusual as the vast majority of petitions for rehearing are denied. As earlier noted, there is no requirement that the petition for rehearing be denied after expiration of the 30-day period prescribed in rule 24(a).

The procedures used in this case fully conformed to this court's internal practice. No one has suggested that the petition would have received more careful consideration had it been considered at a later conference, or that two days was insufficient time to review the merits. Moreover, a delay in scheduling the conference would have produced this result: a minority of the court would have prevailed, by delay, in their position against immediate finality.

In sum, the court exemplified a bend-over-backwards stance throughout these proceedings, and the litigants and amici were afforded a "reasonable opportunity to be heard" (*Metropolitan Water Dist.* v. *Adams* (1942) 19 Cal.2d 463, 476 [122 P.2d 257]), notwithstanding the dissent's contrary suggestion. This court at all times acted in accordance with its rules—both internal and codified—in considering the respective positions of the litigants and amici. With respect to real party's petition for hearing, each justice had full opportunity to review the petition and conference memorandum, consider the merits, and discuss the matter at conference. The question is not one of "precipitancy" but of thoroughness of review. (Compare, for example, the procedure on rehearing commonly employed in the Court of Appeal where no memorandum is prepared and no conference held; rather, each justice reads the petition and

signs his or her vote—for or against rehearing—on the cover of the petition, often on the same day it is filed.)

The minute order I filed as Acting Chief Justice on November 18, 1982, makes clear the position of the majority in this case. The constitutional challenge to the statute having been found unmeritorious by this court (after expedited review), a majority of the court having been convinced that no issue raised on petition for rehearing (by the only party to do so) warranted rehearing, and the other parties having waived their right to request rehearing or modification by stipulation (or, in the case of amici, by failing to file a brief within the time prescribed by rule 27(b)), there was no legal reason to further delay "implementation of responsibilities that our Constitution entrusts to the Legislature." (Minute order of Nov. 18, 1982, *ante,* at p. 256.)