121 Cal.Rptr.2d 51 (2002)
98 Cal.App.4th 969
37 P.3d 647
Steven WHITE, Plaintiff and Appellant,
v.
Gray DAVIS, as Governor, etc., et al., Defendants and Respondents.
Howard Jarvis Taxpayers Association et al., Plaintiffs and Respondents,
v.
Kathleen Connell, as Controller, etc., Defendant and Appellant;
California State Employees Association, Local 1000, SEIU, AFL-CIO, CLC et al., Interveners and Appellants. [And three other cases.[*]].
No. B122178 & B123992.
Court of Appeal, Second District, Division Four.
May 29, 2002.
Review Granted August 14, 2002.
*55 Law Offices of Richard I. Fine & Associates, Richard I. Fine, Los Angeles, Jeremy Faith, Genalin Sulat, Carmela Tan, Cheri Vu; Jonathan M. Coupal, Sacramento, and Trevor A. Grimm, Los Angeles, for Plaintiff and Appellant Steven White in B122178, and for Plaintiffs and Respondents Howard Jarvis Taxpayers Association and Steven White in B123992.
Daniel E. Lungren and Bill Lockyer, Attorneys General, Linda A. Cabatic, Senior Assistant Attorney General, Paul H. Dobson, Keith Yamanaka and Jennifer K. Rockwell, Deputy Attorneys General, for Defendant and Appellant Kathleen Connell in B123992 and for Defendants and Respondents Gray Davis, Kathleen Connell and Matt Fong in B122178.
Anne M. Giese, Daniel S. Connolly, Sacramento, and Michael D. Hersh, Santa Fe Springs, for Interveners and Appellants Gary Gavinski and California State Employees Association, Local 1000, SEIU, AFL-CIO, CLC.
Dennis F. Moss for Interveners and Appellants Professional Engineers in California Government and California Association of Professional Scientists.
Joel H. Levinson, West Sacramento, for Intervener and Appellant California Correctional Peace Officers Association.
Carroll, Burdick & McDonough, Gary M. Messing, and Cathleen A. Williams, Sacramento, for Intervener and Appellant California Union of Safety Employees.
Bion M. Gregory, Richard Thomson; Eisen & Johnston Law Corporation and Marian M. Johnston, Sacramento, for Defendants and Respondents Bill Lockyer, Cruz M. Bustamante, Rob Hurtt, and Curt Pringle.
CURRY, J.
The two actions underlying the consolidated appeals before us arise from the state budget impasses in 1997 and 1998. In the first action, Steven White sought declaratory and injunctive relief regarding the conduct of several state officials during the budget impasse in 1997, and demurrers to the individual's first amended complaint were sustained without leave to amend. In the second action, the Howard Jarvis Taxpayers Association (Jarvis), joined by White, sought injunctive relief barring Kathleen Connell, Controller for the State of California (the Controller), from issuing warrants prior to the passage of a budget in 1998, and the trial court issued a preliminary injunction.
In view of the Legislature's enactment of budget acts for the 1997-1998 and 1998-1999 fiscal years and concessions by Jarvis *56 and White during oral argument before us, we dismiss the appeal in the first action as moot. Although the appeal in the second action is also technically moot, we retain the case for decision due to the importance of the issues raised.
Regarding the preliminary injunction issued in the second action, we affirm in part and reverse in part. As we explain below (see Discussion, pt. II., post), the Controller may disburse funds during a budget impasse when state and federal law properly authorizes or requires their payment, despite the absence of a budget act or emergency appropriation. In some cases, state laws and provisions of the California Constitution function as appropriations outside the budget act. Furthermore, due to the supremacy clause of the United States Constitution, some federal laws require the payment of funds, notwithstanding the requirement for an appropriation in the California Constitution.
To the extent that the parties have identified particular state and federal laws, we conclude that absent a budget act or emergency appropriation, the Controller may properly disburse funds pursuant to (1) continuing appropriations found in statutes and other provisions of law, (2) article III, section 4, and article XVI, section 8.5 of the California Constitution, (3) the Federal Labor Standards Act (29 U.S.C. § 201 et seq.), and (4) federal funding mandates applicable to the Food Stamp program (7 U.S.C. § 2011 et seq.), Foster Care and Adoption programs (42 U.S.C. § 670 et seq.), Child Support program (42 U.S.C. §§ 651-669b), and Child Welfare Services program (42 U.S.C. §§ 620-628).[1]

RELEVANT FACTUAL AND PROCEDURAL HISTORY
Steven White initiated the first underlying action on July 25, 1997. On September 22, 1997, White filed his first amended complaint against the following individuals then holding elected office: Pete Wilson, Governor of the State of California, Gray Davis, Lieutenant Governor of the State of California, Kathleen Connell, Controller for the State of California, and Matt Fong, Treasurer of the State of California, as well as Bill Lockyer, President Pro Tempore of the Senate of the State of California, Cruz M. Bustamante, Speaker of the Assembly of the State of California, Rob Hurtt, Senate Republican Leader, and Curt Pringle, Assembly Republican Leader.[2]
White's first amended complaint sought declaratory and injunctive relief. It alleged that the Legislature had failed to pass a budget for the 1997-1998 fiscal year by the constitutionally mandated date of June 15, 1997 (Cal. Const., art. IV, § 12), and that from June 15, 1997 to August 18, 1997, when a budget was finally enacted and approved, the Controller was improperly permitted to pay funds from the state treasury to welfare recipients, state employees, members of the Legislature and other individuals without the enactment of *57 a constitutionally mandated emergency appropriation bill (Cal. Const., art. IV, § 12; art. XVI, § 7).
Following a hearing on March 13, 1998, the trial court sustained the defendants' demurrers to White's first amended complaint without leave to amend, concluding that White's claims were moot for the 1997-1998 fiscal year, and premature for the following fiscal year. White appealed from the subsequent order of dismissal (B122178).
On June 24, 1998, Jarvis and White initiated the second underlying action with a complaint for declaratory and injunctive relief, and for a writ of mandate, against the Controller in her capacity as state controller. The complaint alleged that the Legislature had not passed a budget for the 1998-1999 fiscal year by June 15, 1998, that under the state Constitution, the state government "must close" in the absence of a budget or emergency bills, and that the Controller was likely to disburse funds despite this constitutional mandate.
On July 9, 1998, the trial court issued a temporary restraining order barring the Controller from paying out funds absent a budget or an emergency appropriation, unless the payments were authorized by a continuing appropriation or by federal law. Subsequently, the trial court granted intervener status to several state employees, unions, and professional associations (the state employee interveners),[3] as well as to Jerome Feitelberg and Alameda Drug Company.[4]
On July 21, 1998, the trial court issued a preliminary injunction barring the Controller from disbursing any funds absent a budget, with the exception of funds properly appropriated prior to July 1, 1998, for expenditure in the 1998-1999 fiscal year, funds properly appropriated pursuant to emergency bills, and payments of minimum wages and overtime compensation required under the Federal Labor Standards Act (FLSA) (29 U.S.C. § 201 et seq.) for work performed prior to July 21, 1998. Jarvis and White were required to post a $100,000 bond.
The Controller and the state employee interveners appealed from the order granting the preliminary injunction (B123992). In connection with this appeal, several of the state employee interveners sought to stay enforcement of the preliminary injunction by petition for writ of supersedeas in the Court of Appeal. In addition, the Controller and the state employee interveners filed petitions for writ of mandate in the Supreme Court.[5] On July 28, 1998, Division Two of this district issued a writ of supersedeas, and the petitions for writ of mandate before the Supreme Court were subsequently transferred to Division Two (B124395, B124397, B124398). The appeal in the second action and related petitions were ultimately transferred to *58 this court, and consolidated with the appeal in the first action pending before us.

DISCUSSION

I.
The issue of mootness arises at the threshold of our discussion because the Legislature enacted (albeit belatedly) budgets for the 1997-1998 and 1998-1999 fiscal years. Furthermore, during oral argument, counsel for Jarvis and White represented that no further relief would be sought in the superior court in the underlying actions. In addition, counsel for Jarvis and White represented that White would not pursue his claims in the first action against Lockyer, Bustamante, Hurtt, Pringle, or any other legislators, that the first action had otherwise merged into the second action, and that Jarvis and White seek a decision from us only on the substantive legal issues regarding the Controller's disbursement of funds raised in the second action.
Under these circumstances, the cases before us are technically moot. However, appellate courts have the "discretion to decide otherwise moot cases presenting important issues that are capable of repetition yet tend to evade review." (Conservatorship of Wendland (2001) 26 Cal.4th 519, 524, fn. 1, 110 Cal.Rptr.2d 412, 28 P.3d 151; see County of Fresno v. Shelton (1998) 66 Cal.App.4th 996, 1006, 78 Cal. Rptr.2d 272.) Here, the issues presented are of profound public significance and arise with some frequency, but escape review with the enactment of a budget. Long before the events underlying the cases before us, our Supreme Court remarked in Jarvis v. Cory (1980) 28 Cal.3d 562, 574, footnote 6, 170 Cal.Rptr. 11, 620 P.2d 598, that budget impasses have "practically become an annual event...."
In view of the concessions by Jarvis and White, we dismiss the first action as moot, but retain the second action for decision. For this reason, we limit our inquiry to the questions presented by the preliminary injunction issued in the second action.

II.
In the appeal in the second action, the Controller and the state employee interveners contend that during a budget impasse, the Controller may disburse funds pursuant to (1) continuing appropriations, (2) provisions of the California Constitution, and (3) the FLSA and other federal law. In addition, they contend that (4) the trial court did not require Jarvis and White to post an adequate bond.

A. Standard of Review

In determining whether to issue a preliminary injunction, the trial court considers two related factors: (1) the likelihood that the plaintiff will prevail on the merits of its case at trial, and (2) the interim harm that the plaintiff is likely to sustain if the injunction is denied as compared to the harm that the defendant is likely to suffer if the court grants a preliminary injunction. (King v. Meese (1987) 43 Cal.3d 1217, 1226, 240 Cal.Rptr. 829, 743 P.2d 889.) "The latter factor involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo." (Abrams v. St. John's Hospital & Health Center (1994) 25 Cal. App.4th 628, 636, 30 Cal.Rptr.2d 603.)
The determination whether to grant a preliminary injunction generally rests in the sound discretion of the trial court. (Abrams v. St. John's Hospital & Health Center, supra, 25 Cal.App.4th at p. 636, 30 Cal.Rptr.2d 603.) "Discretion is abused when a court exceeds the bounds of reason or contravenes uncontradicted evidence. *59 [Citation.]" (Jessen v. Keystone Savings & Loan Assn. (1983) 142 Cal.App.3d 454, 458, 191 Cal.Rptr. 104.)
"The granting of a preliminary injunction does not constitute a final adjudication of the controversy. [Citation.] Its purpose is to preserve the status quo until a final determination following a trial. [Citation.]" (Scaringe v. J.C.C. Enterprises, Inc. (1988) 205 Cal.App.3d 1536, 1542, 253 Cal.Rptr. 344, disapproved on another ground in Citizens for Covenant Compliance v. Anderson (1995) 12 Cal.4th 345, 359, 367, 47 Cal.Rptr.2d 898, 906 P.2d 1314.)
To the extent that the trial court's ruling rests on factual findings regarding the pertinent factors, we review the record for substantial evidence to support the findings. (American Academy of Pediatrics v. Van de Kamp (1989) 214 Cal.App.3d 831, 838-839, 263 Cal.Rptr. 46.) However, to the extent that the ruling presents an issue of pure law not presenting factual issues, we review the determination de novo. (See Efstratis v. First Northern Bank (1997) 59 Cal.App.4th 667, 671-672, 69 Cal.Rptr.2d 445.)

B. Continuing Appropriations

In issuing the preliminary injunction, the trial court concluded that funds may not be disbursed pursuant to continuing appropriations in the absence of a budget act or emergency appropriation. In our view, the trial court erred on this matter.
Before the trial court, Jarvis and White argued in general terms that continuing appropriations lack a constitutional basis. The Controller disputed this contention, and pointed to statutes and other provisions of laws that purportedly establish continuing appropriations, including general obligation bond acts approved by the voters pursuant to article XVI, section 1 of the state Constitution. The trial court concluded that Jarvis and White's general contention was correct, and it did not make individualized determinations as to whether any of the statutes or laws cited by the Controller establish a continuing appropriation.[6]
Setting aside Jarvis and White's general contention that such continuing appropriations are constitutionally infirm, they do not argue on appeal that any of the cited statutes and laws are not intended to create continuing appropriations. Because the trial court did not address the existence of individual continuing appropriations and a full showing has not been made regarding them, we limit our inquiry to Jarvis and White's contention regarding the constitutional soundness of continuing appropriations.
*60 Generally, "[i]n construing constitutional and statutory provisions, whether enacted by the Legislature or by initiative, the intent of the enacting body is the paramount consideration." (In re Lance W. (1985) 37 Cal.3d 873, 889, 210 Cal.Rptr. 631, 694 P.2d 744.) To determine this intent, we look first to the plain language of the law, read in context, and will not add to the law or rewrite it to conform to an assumed intent not apparent from the language. (People ex rel. Lungren v. Superior Court (1996) 14 Cal.4th 294, 301, 58 Cal.Rptr.2d 855, 926 P.2d 1042.) Whenever possible, we seek an interpretation that harmonizes Constitution and statute. (California Housing Finance Agency v. Elliott (1976) 17 Cal.3d 575, 594, 131 Cal. Rptr. 361, 551 P.2d 1193.)
Article IV, section 12, subdivision (c) of the California Constitution provides in pertinent part: "The Legislature shall pass the budget bill by midnight on June 15 of each year. Until the budget bill has been enacted, the Legislature shall not send to the Governor for consideration any bill appropriating funds for expenditure during the fiscal year for which the budget bill is to be enacted, except emergency bills recommended by the Governor or appropriations for the salaries and expenses of the Legislature."
Article XVI, section 7 of the California Constitution further provides that "[m]oney may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." As the court explained in California Assn. for Safety Education v. Brown (1994) 30 Cal.App.4th 1264, 1282, 36 Cal.Rptr.2d 404, "[a]n appropriation is a legislative act setting aside `a certain sum of money for a specified object in such manner that the executive officers are authorized to use that money and no more for such specified purpose.' [Citation.] A continuous appropriation runs from year to year without the need for further authorization in the budget act. [Citations.]" (Fn. omitted, italics added.) Government Code sections 16304 and 13340, which fall within the statutory scheme governing appropriations, recognize and regulate continuing appropriations.[7] (30 Cal.App.4th at p. 1282, 36 Cal.Rptr.2d 404.)
Generally, the Legislature "may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution." (Methodist Hosp. of Sacramento v. Saylor (1971) 5 Cal.3d 685, 691, 97 Cal.Rptr. 1, 488 P.2d 161.) Here, nothing in article IV, section 12, expressly bars continuing appropriations. On its face, section 12 prohibits the Legislature from sending specified appropriation *61 bills to the Governor prior to the enactment of a budget, and it provides for exceptions to this prohibition; it does not otherwise limit the Legislature's authority to enact appropriations.
Jarvis and White nonetheless contend that continuing appropriations are constitutionally unsound, arguing that (1) the structure of the budget process, as delineated in the state Constitution, bars such appropriations, and that (2) the revision of the state Constitution in 1966 that resulted in article IV, section 12, abrogated the constitutional basis for such appropriations. We disagree. As we explain below, prior to the 1966 revision, former article IV, section 34 of the Constitutionthe predecessor of article IV, section 12permitted the disbursement of funds pursuant to continuing appropriations, and nothing in the 1966 revision eliminated the constitutional basis for these appropriations.

1. Former Article IV, Section 34

Former section 34 of article IV, which was adopted in 1922, provided in pertinent part: "The Governor shall, [at] each regular session of the Legislature, submit to the Legislature, with an explanatory message, a budget containing a complete plan and itemized statement of all proposed expenditures of the State provided by existing law or recommended by him.... The budget shall be accompanied by an appropriation bill covering the proposed expenditures, to be known as the budget bill.... Until the budget bill has been finally enacted, neither house shall place upon final passage any other appropriation bill, except emergency bills recommended by the governor, or appropriations for the salaries, mileage and expenses of the senate and assembly." (Italics added.)
In Railroad Commission v. Riley (1923) 192 Cal. 54, 56-58, 218 P. 415, our Supreme Court addressed whether former article IV, section 34, impliedly repealed a statute that had created a special fund for the use of the Railroad Commission, and financed from the collection of fees. The Railroad Commission sought a writ of mandate when the state controller declined to deposit fees in the fund following the adoption of former article IV, section 34. (192 Cal. at pp. 54-55, 58, 218 P. 415.)
In granting the writ, the court in Railroad Commission concluded nothing in former article IV, section 34, barred the fund's existence, citing the principle that "[r]epeals by implication are not favored and are recognized only when there is an irreconcilable conflict between two or more existing legislative enactments." (Railroad Commission v. Riley, supra, 192 Cal. at p. 57, 218 P. 415.) On this matter, the Railroad. Commission court placed special emphasis on the requirement in former article IV, section 34, that the Governor should submit a budget identifying proposed expenditures "`provided by existing law.'" (192 Cal. at pp. 57-58, 218 P. 415.)
Subsequently, in Riley v. Thompson (1924) 193 Cal. 773, 776, 227 P. 772, the state controller sought a writ of mandate to transfer to the state treasury a special fund created by statute to pay the salaries and operating costs of the commission that regulated harbor pilots. The fund was financed from fees collected from harbor pilots. (Id. at p. 778, 227 P. 772.) The state controller argued that money in the fund should be absorbed into the treasury because the state budget contained a small appropriation for the commission, even though the budget allocated no funds to pay the commissioners' salaries. (Id. at pp. 776, 780, 227 P. 772.)
Our Supreme Court denied the writ, concluding that neither the state budget nor former article IV, section 34, abolished the fund. (Riley v. Thompson, supra, 193 Cal. at pp. 778-781, 227 P. 772.) Further-more, *62 the court in Riley held that the commissioners' salaries were properly paid from the fund, despite the absence of an allocation in the budget for this purpose. (Id. at p. 781, 227 P. 772.)
In numerous other cases prior to 1966, the Supreme Court affirmed the existence and propriety of continuing appropriations. (Gillum v. Johnson (1936) 7 Cal.2d 744, 758, 63 P.2d 810; Daugherty v. Riley (1934) 1 Cal.2d 298, 308-309, 34 P.2d 1005; Board etc. Commrs. v. Riley (1924) 194 Cal. 37, 49, 227 P. 775; Jamme v. Riley (1923) 192 Cal. 125, 126-129, 218 P. 578; Reiser v. State Board of Control (1923) 192 Cal. 129,130-132, 218 P. 1016.)

2. 1966 Constitutional Revisions

In the early 1960's, the voters of California and the Legislature began a "vast project to modernize and update the state's antiquated constitution." (Sumner, Constitutional Revision By Commission in California (1972) 1 Western St. U. L.Rev. 48, 48 (hereafter Sumner).) "Under procedures authorized by the constitution, the Legislature, in 1961, adopted a constitutional amendment that authorized the Legislature to act, in effect, as a constitutional convention by allowing it to submit proposals for revision of the constitution to the voters. The amendment was placed on the November 1962 ballot and was approved by the voters by a margin of more than 2 to 1." (Ibid.)
The Legislature subsequently created the Constitutional Revision Commission to implement this amendment. (Sumner, supra, at p. 48.) In 1966, the commission's first set of proposals, which rewrote approximately one-third of the constitution, was adopted by the Legislature and approved by the voters. (Id. at p. 49.) "Along with the changes contained in the revision, 16,000 words were deleted from the constitution." (Ibid.)
Under the 1966 revision, former section 34 of article IV was renumbered section 12 of that article, and its language was simplified. The change most pertinent here concerns the requirement in former section 34 concerning the Governor's duty to submit a budget. Following the 1966 revisions, this requirement now states in pertinent part that "the Governor shall submit to the Legislature, with an explanatory message, a budget for the ensuing fiscal year containing itemized statements for recommended state expenditures and estimated state revenues." (Cal. Const., art. IV, § 12, subd. (a).)
As part of the revision process, the Legislature also enacted former Government Code section 12016, which provided in pertinent part that "[t]he budget required by the State Constitution to be submitted by the Governor ... shall contain a complete plan and itemized statement of all proposed expenditures of the state provided by existing law or recommended by him...." (Italics added; added by Stats. 1966, ch. 161, § 9.3, p. 713; repealed by Stats.1984, ch. 1286, § 2.) This statute became effective only upon the voters' approval of the constitutional revisions at issue here. (Stats.1966, ch. 161, § 33, p. 720; Stats.1966, ch. 139, § 12, p. 969.)

3. Constitutional Soundness of Continuing Appropriations

Following the 1966 revision, the Courts of Appeal have recognized the existence of continuing appropriations (e.g., California Assn. for Safety Education v. Brown, supra, 30 Cal.App.4th at p. 1283, 36 Cal.Rptr.2d 404; Walsh v. Board of Administration (1992) 4 Cal.App.4th 682, 689-699 & fn. 5, 6 Cal.Rptr.2d 118), but no court has addressed whether the 1966 revision abrogated such appropriations.
*63 The language of article IV, section 12, closely resembles that of former article IV, section 34, which, as we have explained (see pt. I., B.2., ante), authorized the disbursement of funds from continuing appropriations independent of a budget act. This similarity of language supports the conclusion that the two provisions carry the same meaning.
As the court explained in County of Sacramento v. Hickman (1967) 66 Cal.2d 841, 850, 59 Cal.Rptr. 609, 428 P.2d 593, "`[i]n the absence of contrary indication in a constitutional amendment, terms used therein must be construed in the light of their statutory meaning or interpretation in effect at the time of its adoption.'" (Quoting Michels v. Watson (1964) 229 Cal. App.2d 404, 408, 40 Cal.Rptr. 464.) This is because "`we cannot suppose that the framers of the new constitution were ignorant of the point decided, or that they intended the provision we adopted from the old constitution to have an operation theretofore uniformly denied to it' [citation]; and the new constitutional provision should be given the construction placed upon its predecessor even though we might not have so decided the point as a matter of first impression [citation]." {County of Sacramento v. Hickman, supra, 66 Cal.2d at p. 850, 59 Cal.Rptr. 609, 428 P.2d 593; see Professional Engineers v. Department of Transportation (1997) 15 Cal.4th 543, 564, 63 Cal.Rptr.2d 467, 936 P.2d 473.)
Jarvis and White disagree, contending that the removal of the phrase "by existing law" from the statement of the Governor's duty to propose a budget in article IV, section 12, and its concurrent placement in former Government Code section 12016 by the Legislature signaled the abrogation of continuing appropriations. They observe that the court in Railroad Commission v. Riley, supra, 192 Cal. at pages 56-58, 218 P. 415, cited the presence of this phrase in former article IV, section 34, as evidence for its conclusion that former section 34 did not repeal continuing appropriations.
We are not persuaded. The issue presented is similar to that resolved in Railroad Commission v. Riley, supra, 192 Cal. 54, 218 P. 415. Thus, following Railroad Commission, we decline to find a repeal by implication unless "there is an irreconcilable conflict between two or more existing legislative enactments." Id. at p. 57, 218 P. 415; see Caminetti v. Pac. Mutual L. Ins. Co. (1943) 22 Cal.2d 344, 367, 139 P.2d 908.) No such conflict is present here.
Rather, the language and history of article IV, section 12, and former Government Code section 12016 indicate that the 1966 revision was intended to preserve continuing appropriations. The duty regarding the budget imposed on the Governor under former Government Code section 12016, on its face, is consistent with the duty stated in subdivision (a) of article IV, section 12: the phrase "recommended state expenditures" in article IV, section 12, reasonably encompasses expenditures "provided by existing law or recommended by" the Governor, as stated in former Government Code section 12016.
Moreover, as our Supreme Court remarked regarding another provision of article IV, the 1966 revision to article IV "was intended solely to shorten and simplify the Constitution, deleting unnecessary provisions: it did not enact any substantive change in the power of the Legislature and the people." (Associated Home Builders etc., Inc. v. City of Livermore (1976) 18 Cal.3d 582, 595, fn. 12, 135 Cal. Rptr. 41, 557 P.2d 473.) Nothing in the legislative history of article IV, section 12, or former Government Code section 12016 that the parties have submitted to us betrays an intent to abrogate continuing appropriations.
*64 By contrast, Jarvis and White contend that article IV, section 12, abrogated the continuing appropriations denoted by the phrase "provided by existing law" in former Government Code section 12016, despite the intertwined history of these provisions. However, in assessing this history, the settled principles of construction direct us to accord a "strong presumption in favor of the Legislature's interpretation of a provision of the Constitution." (Methodist Hosp. of Sacramento v. Saylor, supra, 5 Cal.3d at p. 692, 97 Cal.Rptr. 1, 488 P.2d 161.) Here, the interpretation advanced by Jarvis and White renders the Legislature's placement of the phrase at issue in former Government Code section 12016 "redundant and a nullity, thereby violating one of the most elementary principles of statutory construction. [Citations.]" (Cal Pacific Collections, Inc. v. Powers (1969) 70 Cal.2d 135, 139, 74 Cal.Rptr. 289, 449 P.2d 225.)
The trial court therefore erred in determining that continuing appropriations are constitutionally infirm. Because "[a]n injunction cannot be granted `[t]o prevent officers of the law from executing a public statute for the public benefit[ ]'" (6 Witkin, Cal. Procedure (4th ed. 1997) Provisional Remedies, § 332, p. 265), the preliminary injunction must be reversed insofar as it rests on this determination.

C. Constitutionally Mandated Payments

In concluding that continuing appropriations lack a constitutional basis, the trial court impliedly rejected the Controller's contentions that certain provisions of the state Constitution mandate payments from the treasury independent of the budget act. The Controller argues that section 4 of article III, which addresses judicial salaries, and sections 8 and 8.5 of article XVI, which address school funding, constitute payment obligations that do not require an appropriation in the budget act or emergency appropriation.
Our inquiry into these contentions is guided by the principle that "in interpreting modern constitutions, their provisions will be presumed to be self-executing and to be given effect without legislation, unless a contrary intention is clearly expressed." (Flood v. Riggs (1978) 80 Cal. App.3d 138, 154, 145 Cal.Rptr. 573.) As our Supreme Court explained long ago in Denninger v. Recorder's Court (1904) 145 Cal. 629, 635, 79 P. 360, "a necessary corollary to this proposition is[ ] that a constitutional provision not strictly self-executing becomes operative just as soon as it is supplemented by so much legislation as is absolutely necessary to supply its deficiencies ...." (Italics added; accord, In re Redevelopment Plan for Bunker Hill (1964) 61 Cal.2d 21, 75, 37 Cal.Rptr. 74, 389 P.2d 538.)
Instructive applications of this principle and its corollary are found in San Francisco v. Dunn (1886) 69 Cal. 73, 10 P. 191, and Clausing v. San Francisco Unified School Dist. (1990) 221 Cal.App.3d 1224, 271 Cal.Rptr. 72. In San Francisco, our Supreme Court addressed former article IV, section 22 of the state Constitution. This section stated that "[n]o money shall be drawn from the Treasury but in consequence of appropriation made by law, and upon warrants duly drawn thereon by the Controller," but permitted the Legislature, "notwithstanding anything contained" in the Constitution, to grant aid to counties, cities, towns, and private entities that supported orphans, with the proviso that enumerated counties, cities and towns that supported orphans were entitled to "the same pro rata appropriations as may be granted to such institutions under church, or other control."
*65 In San Francisco, the city and county of San Francisco sought a writ of mandate directing the state controller to disburse the pro rata allocation of aid accorded to them under former section 22 of article IV. (San Francisco v. Dunn, supra, 69 Cal. at p. 74, 10 P. 191.) Observing that the Legislature had granted aid to private institutions within San Francisco, the court in San Francisco held that the writ was properly granted, reasoning that "[s]uch appropriation having been made, the ... proviso [in former article IV, section 22] became self-executing as to counties, cities and counties, cities, and towns; and no further legislative action was required." (69 Cal. at p. 74, 10 P. 191.)
By contrast, in Clausing, a student, together with his parent and guardian, asserted a claim for damages under subdivision (c) of article I, section 28 of the state Constitution, which provides that all students attending public schools "`have the inalienable right to attend campuses which are safe, secure and peaceful.'" (Clausing v. San Francisco Unified School Dist, supra, 221 Cal.App.3d at pp. 1235-1236, 271 Cal.Rptr. 72.) Noting that a provision of the Constitution may be mandatory without being self-executing, the court in Clausing concluded that a demurrer to this claim was properly sustained, reasoning that subdivision (c) of section 28 did not provide a remedy for its violation, and no statute filled this gap. (Clausing, at pp. 1235-1238, 1241, & fn. 5, 271 Cal.Rptr. 72.) In so concluding, the Clausing court stated: "The right proclaimed in section 28, subdivision (c), although inalienable and mandatory, simply establishes the parameters of the principle enunciated; the specific means by which it is to be achieved for the people of California are left to the Legislature." (Clausing, at p. 1237, 271 Cal.Rptr. 72, fn. omitted.)

1. Article III, Section. 4

With qualifications not relevant here, subdivision (a) of article III, section 4, provides: "[S]alaries of elected state officers may not be reduced during their term of office. Laws that set these salaries are appropriations." (Italics added.) Observing that the salaries of state judges are set by Government Code section 68200 et seq., the Controller argues that she may disburse funds to pay these salaries independent of a budget act or emergency appropriation.
In our view, the Controller is correct. Subdivision (a) of article III, section 4, by its plain language, became self-executing with the Legislature's enactment of the statutes setting judicial salaries in the Government Code. Under San Francisco, "no further legislative action [is] required" to authorize payment of these salaries. (San Francisco v. Dunn, supra, 69 Cal. at p. 74, 10 P. 191.)
Our conclusion finds compelling support in Brown v. Superior Court (1982) 33 Cal.3d 242, 188 Cal.Rptr. 425, 655 P.2d 1260. In Brown, the Legislature enacted a statute that authorized several new appellate judges, but provided limited funding for the judges' staff and library. (Id. at pp. 244-246, 188 Cal.Rptr. 425, 655 P.2d 1260.) After some taxpayers challenged the statute, the superior court concluded that the limited funding rendered the statute unconstitutionally infirm, and it enjoined the implementation of the statute. (Ibid.) Shortly thereafter, the Legislature enacted a budget that cured any inadequacies in the funding. (Id. at p. 246, 188 Cal.Rptr. 425, 655 P.2d 1260.)
Recognizing that the Legislature's action had eliminated the original basis for the injunction, the court in Brown addressed other alleged infirmities in the statute. (Brown v. Superior Court, supra, 33 Cal.3d at p. 247, 188 Cal.Rptr. 425, *66 655 P.2d 1260.) The taxpayers contended, inter alia, that the statute was constitutionally unsound because it had not been enacted by a two-thirds majority of the Legislature, as is generally required for appropriations from the state's general fund (Cal. Const., art. IV, § 12, subd. (d)). (Brown, at p. 249, fn. 6, 188 Cal. Rptr. 425, 655 P.2d 1260.) Citing subdivision (a) of article III, section 4, the taxpayers argued that every law setting a judge's salary, including the statute in question, is an appropriation, and thus subject to the two-thirds vote requirement. (Brown, at p. 249, fn. 6, 188 Cal. Rptr. 425, 655 P.2d 1260.)
The Brown court observed that no judges had ever been appointed or drawn a salary under the statute, but nonetheless addressed the merits of this contention. (Brown v. Superior Court, supra, 33 Cal.3d at p. 249, fn. 6, 188 Cal.Rptr. 425, 655 P.2d 1260.) It stated: "The aim of the declaration in article III, section 4, subdivision (a), ... was not to require a two-thirds vote but rather to ordain that even with a mere majority vote certain salary laws are `appropriations.' The critical words were in Proposition 6 adopted by the voters at the November 1972 election. In the voters' pamphlet the Legislative Counsel explained that the words `would eliminate the existing requirement that there be a specific appropriation in the Budget Act, or otherwise, to pay salaries.' ... In other words, though a bill setting salaries of elected state officers is not an appropriation bill it nonetheless takes effect as an appropriation once it has been enacted." (Brown, at pp. 249-250, fn. 6, 188 Cal.Rptr. 425, 655 P.2d 1260.)
Although this discussion by our Supreme Court appears to be dicta, it is persuasive on the issue before us. (Grange Debris Box & Wrecking Co. v. Superior Court (1993) 16 Cal.App.4th 1349, 1358, 20 Cal.Rptr.2d 515; People v. Jackson (1979) 95 Cal.App.3d 397, 402, 157 Cal.Rptr. 154.) We therefore conclude that the Controller may properly disburse funds to pay the salaries set forth in Government Code section 68200 et seq., independently of the budget act.

2. Article XVI, Section 8

The Controller also contends that she may disburse funds independent of a budget act or emergency appropriation pursuant to article XVI, section 8 of the California Constitution.
Subdivision (a) of article XVI, section 8, provides: "From all state revenues there shall first be set apart the moneys to be applied by the state for support of the public school system and public institutions of higher education." Subdivision (b) of the same section states: "Commencing with the 1990-91 fiscal year, the moneys to be applied by the state for the support of school districts and community college districts shall be not less than the greater of the following amounts[ ]...." Subdivision (b) then sets out three formulas.[8] The *67 first of these determines an amount on the basis of the percentage of general fund revenues appropriated for public schools and community colleges in the 1986-1987 fiscal year (Cal. Const., art. XVI, § 8, subd. (b)(1)). The remaining two formulas determine amounts based on the total allocations to public schools and community colleges from defined sources in the prior fiscal year (Cal. Const., art. XVI, § 8, subds.(b)(2), (b)(3)).
These provisions of article XVI, section 8, are the result of voter initiatives. As the court explained in County of Sonoma v. Commission on State Mandates (2000) 84 Cal.App.4th 1264, 1289, 101 Cal.Rptr.2d 784, "Proposition 98, adopted by the voters in 1988, amended article XVI, section 8 of the California Constitution to provide a minimum level of funding for schools. [Citation.] The measure ... set up two tests, later expanded by the passage of Proposition 111 in 1990 to three tests, for determining the mandated minimum funding level for the coming year."
The court in County of Sonoma further observed: "Proposition 98 does not appropriate funds.... The power to appropriate funds was left in the hands of the Legislature. Proposition 98 merely provides the formulas for determining the minimum to be appropriated every budget year. The state's obligation is to ensure specific amounts of moneys are applied by the state for education." (84 Cal.App.4th at p. 1290, 101 Cal.Rptr.2d 784.)
In our view, the County of Sonoma court is correct on this matter. Section 8 of Article XVI, on its face, sets a minimum funding level for public schools and community colleges. Furthermore, the second and third formulas that play a role in determining this level for any given fiscal year presuppose that the Legislature has appropriated a specific amount of money for public schools and community colleges in the prior fiscal year. Accordingly, section 8 of article XVI necessarily requires the Legislature to make a determinate appropriation of funds every year that meets or exceeds the specified minimum; otherwise, the second and third formulas cannot fix a minimum level for the following year.
Thus here, as in Clausing, the provisions of article XVI, section 8, although mandatory, "simply establish[ ] the parameters of the principle enunciated" and leave "the specific means by which it is to be achieved for the people of California ... to the Legislature." (Clausing v. San Francisco Unified School Dist, supra, 221 Cal.App.3d at p. 1237, 271 Cal.Rptr. 72, fn. omitted.) We therefore conclude that they do not constitute a self-executing authorization to disburse funds.
*68 Appellants nonetheless contend that the injunction improperly blocks funding for public education and other important governmental functions, arguing that the balance of harms do not favor Jarvis and White. We are not persuaded. We agree that barring the disbursement of such funds may cause severe distress during a budget impasse absent an emergency appropriation by the Legislature. However, in the present case, the Legislature enacted an emergency appropriation to fund vital services and pay the salaries of state employees the day after the trial court issued its injunction. (Stats.1998, ch. 213, § 1, No. 4 West's Cal. Legis. Service, p. 797.) In any event, as our Supreme Court stated in Common Cause v. Board of Supervisors (1989) 49 Cal.3d 432, 447, 261 Cal.Rptr. 574, 777 P.2d 610, "if the party seeking the injunction can make a sufficiently strong showing of likelihood of success on the merits, the trial court has discretion to issue the injunction notwithstanding that party's inability to show that the balance of harms tips in his favor. [Citation.]" (Italics added.)

3. Article XVI, Section 8.5

Finally, the Controller contends that she may disburse funds independent of a budget act or emergency appropriation pursuant to article XVI, section 8.5 of the California Constitution.
Section 8.5 of article XVI establishes additional education funding subject to article XIII B, which limits government spending. As the court explained in Hayes v. Commission on State Mandates (1992) 11 Cal.App.4th 1564, 1580, footnote 7, 15 Cal.Rptr.2d 547, "[a]s it was originally enacted, article XIII B required that all governmental entities return revenues in excess of their appropriations limits to the taxpayers through tax rate or fee schedule revisions. In Proposition 98, adopted at the November 1988 General Election, article XIII B was amended to provide that half of state excess revenues would be transferred to the state school fund for the support of school districts and community college districts. [Citations.]"
Subdivision (a)(1) of article XIII B, section 2, provides: "Fifty percent of all revenues received by the state in a fiscal year and in the fiscal year immediately following it in excess of the amount which may be appropriated by the state in compliance with this article during that fiscal year and the fiscal year immediately following it shall be transferred and allocated, from a fund established for that purpose, pursuant to Section 8.5 of Article XVI."
The voters also enacted article XVI, section 8.5, in adopting Proposition 98. (California Teachers Assn. v. Hayes (1992) 5 Cal.App.4th 1513, 1530, 7 Cal.Rptr.2d 699.) Subdivision (a) of article XVI, section 8.5, states that in addition to the funding required under article XVI, section 8, the controller "shall during each fiscal year transfer and allocate all revenues available" under the pertinent provisions of article XIII B "to that portion of the State School Fund restricted for elementary and high school purposes, and to that portion of the State School Fund restricted for community college purposes, respectively, in proportion to the enrollment in school districts and community college districts respectively." Subdivision (d) of article XVI, section 8.5, mandates that these funds "shall be expended solely for the purposes of instructional improvement and accountability as required by law."
Noting these provisions of article XVI, section 8.5, the court remarked in California Teachers Assn. v. Hayes, supra, 5 Cal.App.4th at page 1530, 7 Cal.Rptr.2d 699: "The measure is self-executing; it requires no legislative action.... [¶] ... Section 8.5 does not extend the Legislature's *69 spending power to excess revenues; rather it imposes a self-executing, ministerial duty upon the Controller to transfer such excess revenues to a restricted portion of the school fund and thence to allocate such revenues to school districts and community college districts on a per-enrollment basis. Section 8.5 specifically restricts the purposes for which those funds may be expended."
We agree with the court in California Teachers Assn. Article XVI, section 8.5, and the pertinent provisions of article XIII B constitute a carefully crafted qualification of the spending limits in article XIII B, intended to enhance funding for some educational purposes while removing authority from the Legislature to redirect these funds. As such, article XVI, section 8.5, bears the earmarks of a continuing appropriation entrenched by the voters in the state Constitution. We therefore conclude that this provision contains a self-executing authorization to disburse funds.

D. Payments Pursuant to Federal Law

In issuing the preliminary injunction, the trial court concluded that the Controller was not authorized to disburse funds subject to federal law, with the exception of compensation required under FLSA for work performed prior to the date of the preliminary injunction.
The key issues here concern the extent to which the supremacy clause of the federal Constitution compels the disbursement of funds in accord with federal law during a budget impasse. "The supremacy clause declares, in pertinent part, that `Laws of the United States ... shall be the supreme Law of the Land; and the Judges of every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' (U.S. Const., art VI, cl. 2.)[¶] Since the decision in McCulloch v. Maryland (1819) 17 U.S. (4 Wheat.) 316, 427, [4 L.Ed. 579], `it has been settled that state law that conflicts with federal law is "without effect"' (Cipollone v. Liggett Group, Inc. (1992) 505 U.S. 504, 516, [112 S.Ct. 2608, 120 L.Ed.2d 407])" (Smiley v. Citibank (1995) 11 Cal.4th 138, 147, 44 Cal.Rptr.2d 441, 900 P.2d 690.)

1. FLSA

We begin by examining whether the Controller is required to disburse funds under the FLSA during a budget impasse, absent an appropriation. As we explain below (see pt. D.l.a, D.l.b, post), state employees have a continuing employment relationship with the state during a budget impasse, and thus they are entitled to receive wages and overtime compensation required under the FLSA for work performed during such a period, given the supremacy of federal law.[9] As we further explain (see pt. D.l.c, post), state employees do not have an entitlement to their full salaries (over and above the compensation required under the FLSA) pursuant to the contract clauses of the United States and California Constitutions.
The FLSA requires employers to pay minimum wages (29 U.S.C. § 206(a)) and overtime compensation (29 U.S.C. § 207(a)(1)), and provides for the recovery of unpaid minimum wages, unpaid overtime compensation, and liquidated damages (29 U.S.C. § 216(b)). Generally, "the FLSA is violated unless the minimum wage is paid on the employee's regular *70 payday...." (Biggs v. Wilson (1993) 1 F.3d 1537, 1541.)
These provisions encompass public employers, including the states. (Biggs v. Wilson, supra, 1 F.3d at p. 1543; 29 U.S.C. § 203(d), (e)(2)(C).)[10] Thus, in Biggs v. Wilson, supra, at pages 1538-1543, the Ninth Circuit Court of Appeals concluded that California violated the FLSA in 1990 when it failed to pay the wages owed to a group of public transportation employees under the FLSA during a budget impasse until a budget was enacted.
The trial court in this case determined that under Biggs, the Controller was authorized to pay minimum wages and overtime compensation required under the FLSA for work performed prior to the date of the preliminary injunction, but state employees who continued to work after this date were "volunteers." The trial court thus apparently concluded that a budget impasse nullifies the relationship between the state and its employees, and that employees who continued to work despite notice of this nullification fall outside the protection of the FLSA.
We therefore examine three issues: (1) whether there is a continuing employment relationship between the state and its employees during a budget impasse; (2) whether this relationship, if it exists, falls within the scope of the FLSA; and (3) whether state employees are entitled to payment of their salaries during a budget impasse absent an appropriation, over and above the compensation requirements found in the FLSA.

a. Continuing Employment Relationship

Regarding the first issue, we observe that "[p]ublic employment, by and large, is not held by contract, but by statute. [Citations.]" (Hinchliffe v. City of San Diego (1985) 165 Cal.App.3d 722, 725, 211 Cal.Rptr. 560.) Nonetheless, public employment may give rise to obligations regarding compensation treated as contractual under the contract clauses of the federal and state Constitutions. (Olson v. Cory (1980) 27 Cal.3d 532, 536-538, 178 Cal.Rptr. 568, 636 P.2d 532.)
As the court explained in Markman v. County of Los Angeles (1973) 35 Cal. App.3d 132, 134-135, 110 Cal.Rptr. 610: "The terms and conditions relating to employment by a public agency are strictly controlled by statute or ordinance, rather than by ordinary contractual standards; and one who accepts such employment, thereby benefiting in ways denied an employee of a private employer, must in turn relinquish certain rights which are enjoyed by private employees [citation], one such disability being that the public employee is entitled only to such compensation as is expressly provided by statute or ordinance regardless of the extent of services actually rendered. [Citations.]"
The Legislature has enacted two statutes concerning the status of public employees and the payment of their salaries during an impasse. Government Code section 1231 provides in pertinent part: "No state officer or employee shall be deemed to have a break in service or to have terminated his or her employment, for any purpose, nor to have incurred any change *71 in his or her authority, status, or jurisdiction or in his or her salary or other conditions of employment, solely because of the failure to enact a budget act for a fiscal year prior to the beginning of that fiscal year." Furthermore, Government Code section 1231.1 provides: "Funds from each appropriation made in the budget act for any fiscal year may be expended to pay to officers and employees whatever salary that would have otherwise been received had the budget act been adopted on or prior to July 1, of that fiscal year."
In interpreting these statutes, we seek a construction that is constitutionally sound. (Kortum v. Alkire (1977) 69 Cal.App.3d 325, 333-334, 138 Cal.Rptr. 26.) "Under our Constitution the creation of an enforceable contract with the state requires compliance with the constitutional debt limitation provisions of article XVI, section 1, or a valid appropriation in support of the contract under article XVI, section 7. [Citations.] In this respect our law is consistent with federal law and the law of nearly every state in the Union. [Citations.] Persons who deal with the government are held to have notice of this limitation upon the authority to enter into contracts. [Citation.]" (Walsh v. Board of Administration, supra, 4 Cal.App.4th at p. 699, 6 Cal.Rptr.2d 118.)
Generally, "[u]nder our Constitution the state can incur valid contractual obligations in four ways: (1) by legislative authorization where the liability created will not cause aggregate state liabilities to exceed $300,000; (2) by legislative authorization in case of war to repel invasion or suppress insurrection; (3) by compliance with constitutional debt limitation requirements, which include a two-thirds vote of each house of the Legislature and approval by the majority of the voters at a general election or direct primary; or (4) by legislative authorization supported by an appropriation. ([Cal. Const., a]rt.XVI, §§ 1, 7.)" (Walsh v. Board of Administration, supra, 4 Cal.App.4th at pp. 698-699, 6 Cal.Rptr.2d 118.)
Here, nothing supports a determination that Government Code sections 1231 and 1231.1 establish an obligation to pay employee salaries in conformity with the first three of these ways, which are rooted in the debt limitation provisions of article XVI, section 1. (See Walsh v. Board of Administration, supra, 4 Cal.App.4th at pp. 698-700, 6 Cal.Rptr.2d 118.) Nor do the parties dispute that the salaries at issue here are generally paid pursuant to an appropriation on the general treasury fund, rather than pursuant to a continuing appropriation or constitutional mandate.
Under these circumstances, Government Code sections 1231 and 1231.1 cannot establish an employment relationship that entitles state employees to their salaries during a budget impasse absent an appropriation, given the constitutional limitations that we have described. In our view, these statutes, if constitutionally sound, authorize a continuing employer-employee relationship during a budget impasse under which entitlement to compensation for work done during the budget impasse arises only upon the satisfaction of a condition precedent, namely, the enactment of a budget or other proper appropriation.
Under principles of contract law, an obligation to pay money may be conditioned upon the eventual accrual of funds in a specified source, or when the ability to pay arises. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 736, pp. 666-667.) These principles apply to the right to compensation in contracts of employment. (Ibid.; see, e.g., R.J. Kuhl Corp. v. Sullivan (1993) 13 Cal.App.4th 1589, 1599-1600, 17 Cal.Rptr.2d 425; Farnon v. Cole (1968) 259 Cal.App.2d 855, 858-859, 66 Cal.Rptr. 673; Haines v. Bechdolt *72 (1965) 231 Cal.App.2d 659, 661-663, 42 Cal.Rptr. 53.)
Although the employer-employee relationship at issue here is ultimately governed by statute, we discern no reason rooted in the state Constitution barring the Legislature from subjecting the entitlement to wages earned during a budget impasse to an analogue of a condition precedent. Thus, the entitlement of state employees to compensation for work performed during a budget impasse does not accrue until the enactment of a budget or other proper appropriation. Furthermore, given the friction of democratic politics which Government Code sections 1231 and 1231.1 impliedly recognizestate employees assume the risk that satisfaction of this condition may be delayed due to the Legislature's inaction during a budget impasse. (Cf. Kline v. Johnson (1953) 263 P.2d 494, 121 Cal.App.2d Supp. 851, 852-854 [under broker's compensation agreement, broker assumed risk that employer will not ensure performance of act upon which broker's compensation is conditioned]; 1 Witkin, Summary of Cal. Law, supra, § 765, p. 692; Rest.2d Contracts, § 239(2), com. b, p. 228.)

b. Scope of the FLSA

The second issue is whether this employment relationship falls within the scope of the FLSA. Our research has located little case authority addressing the extent to which the FLSA applies to employer-employee relationships subject to such a condition precedent. Nonetheless, we discern guidance in U.S. v. Klinghoffer Bros. Realty Corp. (2d Cir.1960) 285 F.2d 487.
In Klinghoffer Bros., several security officers who worked for a corporation were asked to guard the property of a second, closely related corporation, which had filed a petition for bankruptcy. (285 F.2d at p. 489.) The security officers were told that due to the second corporation's financial embarrassment, they would not be paid for their additional overtime services until the bankruptcy proceedings ended. (Id. at pp. 489-490.) The security officers provided the additional guard services for a period, but were never compensated during this period, and they ultimately refused to extend any further services at some point before the bankruptcy proceedings terminated. (Id. at p. 490.) The court in Klinghoffer Bros, concluded that the security officers were entitled to prompt and regular payment of overtime compensation under the FLSA, even though they had worked under "a vague understanding that at some indefinite future date, related to the termination of the [bankruptcy] proceedings, they would be taken care of." (Id. at pp. 490-93.)
Here, much as in Klinghoffer Bros., state employees have a continuing relationship with their employer during a budget impasse (Gov.Code, § 1231), subject to the understanding that payment of wages is dependent upon an appropriation (Gov. Code, § 1231.1). Accordingly, their relationship falls within the protection of the FLSA during such an impasse.
As the court explained in Rogers v. City of Troy (2d Cir.1998) 148 F.3d 52, 57, the FLSA requires wages to be paid in a timely fashion, where "what constitutes timely payment must be determined by objective standardsand not solely by reference to the parties' contractual arrangements." Timeliness is fixed by due reference to an employee's "work period" (ibid.), which federal regulations characterize as the employee's "established and regularly recurring period of work" (29 C.F.R. § 553.224(a); see 29 C.F.R. § 778.105). (Rogers, at pp. 57-58.) Under these principles, the FLSA requires the prompt payment of minimum wages and *73 overtime compensation for work performed during a budget impasse, with due reference to the state employee's established work period.[11]

c. Compensation Over and Above the FLSA Requirements

Finally, we address the extent to which state employees are entitled to receive compensation during a budget impasse beyond that required under the FLSA.
The state employee interveners contend that they are entitled to full and regular payment of their salaries during a budget impasse, over and above the payments required by the FLSA, absent a budget act or other proper appropriation.[12] Citing union contracts and memoranda of understanding with the state, they argue that the injunction at issue violates the contract clauses of the United States and California Constitutions, and denies them due process of law. We are not persuaded.
Article I, section 10, clause 1 of the United States Constitution prohibits the states from passing any law impairing the obligation of contracts. Article I, section 9 of the California Constitution contains a similar clause providing that a "law impairing the obligation of contracts may not be passed." Generally, a public employee's right to compensation, once vested, "cannot be eliminated without unconstitutionally impairing the contract obligation," and that "[w]hen agreements of employment between the state and public employees have been adopted by governing bodies, such agreements are binding and constitutionally protected." (Olson v. Cory, supra 27 Cal.3d at p. 538, 178 Cal. Rptr. 568, 636 P.2d 532.)
In interpreting the state contract clause, California courts often followed federal courts that have analyzed the federal contract clause. (Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach (2001) 86 Cal.App.4th 534, 559, fn. 15, 103 Cal. Rptr.2d 447.) Nonetheless, the two clauses differ in their application in at least one respect. Whereas the federal contract clause "is directed only against impairment by legislation and not by judgments of courts" (Tidal Oil Co. v. Flanagan (1924) 263 U.S. 444, 451, 44 S.Ct. 197, 68 L.Ed. 382; see Thompson, The History of the Judicial Impairment "Doctrine" and Its Lessons for the Contract Clause (1992) 44 Stan. L.Rev. 1373, 1375 & fn. 9), the state contract clause also applies to judicial action (Bradley v. Superior Court (1957) 48 Cal.2d 509, 519, 310 P.2d 634). Because the contention in question targets an injunction, we limit our attention to the state contract clause.
*74 Under the state contract clause, "[n]either the court nor the Legislature may impair the obligation of a valid contract...." (Bradley v. Superior Court, supra, 48 Cal.2d at p. 519, 310 P.2d 634, italics added.) However, the contract clause does not protect contracts that are prohibited by law or against public policy. (Griffith v. Connecticut (1910) 218 U.S. 563, 571, 31 S.Ct. 132, 54 L.Ed. 1151; Walsh v. Board of Administration, supra, 4 Cal.App.4th at p. 696, 6 Cal.Rptr.2d 118; People ex rel. Mosk v. Lynam (1967) 253 Cal.App.2d 959, 967, 61 Cal.Rptr. 800.)
Generally, "no contractual obligation may be enforced against a public agency unless it appears the agency was authorized by the Constitution or statute to incur the obligation; a contract entered into by a governmental entity without the requisite constitutional or statutory authority is void and unenforceable." (Air Quality Products, Inc. v. State of California (1979) 96 Cal.App.3d 340, 349, 157 Cal.Rptr. 791.) In our view, the state Constitution precludes the state from incurring an obligation to pay employee salaries during a budget impasse in the absence of a proper appropriation, and thus the failure to pay full salaries under such circumstances does not constitute an impairment of contract under the state contract clause. (Cf. California Assn. for Safety Education v. Brown, supra, 30 Cal. App.4th at pp. 1284-1285, 36 Cal.Rptr.2d 404 [statute does not create obligation protected by contract clause when it gives notice that funds must be separately appropriated by Legislature].)
It is well established that the state cannot abridge its fundamental police powers by contract. As the United States Supreme Court stated in Pennsylvania Hospital v. Philadelphia (1917) 245 U.S. 20, 23, 38 S.Ct. 35, 62 L.Ed. 124, "the States cannot by virtue of the contract clause be held to have divested themselves by contract of the right to exert their governmental authority in matters which from their very nature so concern that authority that to restrain its exercise by contract would be a renunciation of the power to legislate for the preservation of society or to secure the performance of essential governmental duties." Similarly, our Supreme Court has held that "the government may not contract away its right to exercise [its] police power in the future." (Avco Community Developers, Inc. v. South Coast Regional Com. (1976) 17 Cal.3d 785, 800, 132 Cal.Rptr. 386, 553 P.2d 546.)
We recognize that the obligation at issue concerns the state's taxing and spending powers, rather than its police powers, and that modern contract clause jurisprudence follows the "reserved-powers doctrine," which holds that the former powers, unlike the latter powers, may be abridged by contract. (See Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach, supra, 86 Cal.App.4th at pp. 559-561, 103 Cal.Rptr.2d 447.) Under this doctrine, the state may "`bind itself in the future exercise of the taxing and spending powers.'" (Id. at p. 560, 103 Cal.Rptr.2d 447, quoting United States Trust Co. v. New Jersey (1977) 431 U.S. 1, 24, 97 S.Ct. 1505, 52 L.Ed.2d 92.)
However, the obligation here would directly undermine the appropriation requirement in article XVI, section 7 of the state Constitution. As our Supreme Court explained in Humbert v. Dunn (1890) 84 Cal. 57, 59, 24 P. 111, this requirement, which is taken from the United States Constitution, "had its origin in Parliament in the seventeenth century, when the people of Great Britain, to provide against the abuse by the king and his officers of the discretionary money power with which they were vested, demanded that the public *75 funds should not be drawn from the treasury except in accordance with express appropriations therefor made by Parliament [citation]; and the system worked so well in correcting the abuses complained of, our forefathers adopted it, and the restraint imposed by it has become a part of the fundamental law of nearly every state in the Union." In view of the fundamental nature of this requirement, we conclude that the state cannot undertake obligations protected by the contract clause that directly contravene it. To hold otherwise would gut the requirement.
Furthermore, the injunction does not deny state employees due process, insofar as it denies them their salaries over and above the payments required under the FLSA. Under principles of contract interpretation, "`all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated.' [Citation.]" (City of Torrance v. Workers' Comp. Appeals Bd. (1982) 32 Cal.3d 371, 378, 185 Cal.Rptr. 645, 650 P.2d 1162; see 1 Witkin, Summary of Cal. Law, supra, Contracts, § 692, p. 625.) For this reason, state employees must be deemed to have notice of the limitation on the payment of their salaries during a budget impasse. (Walsh v. Board of Administration, supra, 4 Cal. App.4th at p. 699, 6 Cal.Rptr.2d 118.)
Appellants also contend that the balance of harms arising from the failure to pay full salaries does not favor Jarvis and White, pointing to the distress to state employees caused by the denial of their full salaries (over and above the payments required under the FLSA). We recognize the severity of this distress. However, as we have explained (see pt. C.2., ante ), the Legislature enacted an emergency appropriation to pay these salaries the day after the trial court issued its injunction, and an injunction may be properly granted upon "a sufficiently strong showing of likelihood of success on the merits...." (Common Cause v. Board of Supervisors, supra, 49 Cal.3d at p. 447, 261 Cal.Rptr. 574, 777 P.2d 610.)[13]

d. Conclusion

In sum, the preliminary injunction must be reversed to the extent that it denies state employees the compensation required under the FLSA during a budget impasse, absent a proper appropriation.

2. Other Federal Law

Before the trial court, the Controller also contended that other federal *76 laws required her to disburse funds during a budget impasse. In issuing the preliminary injunction, the trial court impliedly rejected this contention.
We find guidance on this issue in Pratt v. Wilson (E.D.Cal.1991) 770 F.Supp. 539 and Dowling v. Davis (9th Cir.1994) 19 F.3d 445. In Pratt, the state controller halted payments partially funded under the now-abolished federal Aid to Families with Dependent Children (AFDC) program[14] during the 1990 budget impasse. (Pratt, at pp. 540-541.) Citing the supremacy clause, the court in Pratt concluded that the state was required to make AFDC payments during the budget impasse despite the appropriation requirements in the state Constitution. (Id. at pp. 543-544.) The Pratt court reasoned that although a state's participation in the AFDC program was voluntary, once the state had elected to participate, it was required to comply with AFDC statutes and regulations mandating timely payments. (Id. at p. 541.)
Dowling also arose out of the 1990 budget impasse. In Dowling, the state controller delayed payments under the Medi-Cal program (Welf. & Inst.Code, § 14000 et seq.), which is partially funded through the federal Medicaid law (42 U.S.C § 1396), and the In-Home Support Service (IHSS) program (Welf. & Inst.Code, § 12300), which was partially funded by a federal block grant. (Dowling v. Davis, supra, 19 F.3d at pp. 446-448.) The state subsequently secured summary judgment in a class action arising from these delayed payments. (Id. at p. 447.)
The court in Dowling affirmed, concluding that there was no evidence that the delayed payments violated federal law. (Dowling v. Davis, supra, 19 F.3d at pp. 447-448.) In reaching this conclusion, the Dowling court reasoned that "[d]elayed payment is an inherent feature of the Medicaid statutory and regulatory framework," that the federal block grant supporting the IHSS program did not require timely payments, and the state statute governing the IHSS program predicated its continuing existence on an appropriation in the state budget act. (Ibid.)
In view of Pratt and Dowling, the key issue is whether the federal laws cited by the Controller require timely payments during a budget impasse. The Controller contends that she is required to disburse funds due to the state's participation in the federal (1) Food Stamp program (7 U.S.C. § 2011 et seq.), (2) Foster Care and Adoption programs (42 U.S.C. §§ 670-679b), (3) Child Support program (42 U.S.C. §§ 651-669b), and (4) Child Welfare Services program (42 U.S.C. §§ 620-628).
Before the trial court, the Controller asserted in conclusory terms that these four federal programs carry requirements for timely payment of funds. On appeal, the Controller cites federal regulations concerning the Food Stamp program that require participating states to "act promptly on all applications" for food stamps benefits (7 C.F.R. § 273.2(a)(2)), to offer expedited services when necessary (ibid.), and to extend benefits no later than 30 days following a new application (7 C.F.R. § 274.2(b)). We therefore conclude that the Food Stamp program falls within the scope of Pratt.
*77 In our view, Pratt also governs the Foster Care and Adoption programs and the Child Support program. The federal statutes governing the Foster Care and Adoption programs state that to receive federal funds, the state must have a plan approved by the Secretary of Health and Human Services that, inter alia, "provides that [it] shall be in effect in all political subdivisions of the [state], and, if administered by them, be mandatory upon them[.]" (42 U.S.C. § 671(a)(3), italics added.) In addition, the federal statutes require payments to enumerated persons and for enumerated purposes. (42 U.S.C. §§ 672(a), 673(a)(1)(B).) Finally, California's approved plan meets these requirements, and identifies classes of children and other persons who shall receive payments. Furthermore, the federal regulations governing the Child Support program require an approved state plan regarding this program, and also require that the pertinent state agency must "assure that the plan is continuously in operation...." (45 C.F.R. § 302.10(c), italics added.) Moreover, these regulations set timeframes for the collection and disbursement of funds by the state agency (45 C.F.R. § 302.32(b)). California's approved plan states that it "is continuously in operation" in accordance with federal regulations. Accordingly, the Controller may properly disburse funds to make timely payments mandated under the Foster Care and Adoption programs and the Child Support program.
Finally, the Controller cites two federal statutes for the proposition that she must disburse funds in connection with the Child Welfare Services program. However, nothing in these statutes mandates timely disbursement of funds. The statutes define the term "child welfare services" to apply to services intended, inter alia, to "assur[e] adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption" (42 U.S.C. § 625(a)(1)(F)). Moreover, they require only that the state plan for services to children under this program must provide for coordination with other services in a manner that "will best promote the welfare of such children and their families" (42 U.S.C. § 622(b)(2)).
The Controller also argues in cursory fashion that despite recent changes in federal law, the Child Welfare Services program is subject to the former AFDC requirements concerning timely payments at issue in Pratt.[15] Of the statutes and regulations cited in Pratt (770 F.Supp. at pp. 541-542), only certain regulations concerning notice of changes in benefits currently apply to the Child Welfare Services program (see 45 C.F.R. § 1355.30(p)). These regulations provide that when "changes in either State or Federal law require automatic grant adjustments for classes of recipients," recipients are entitled to notice of a reduction or suspension of benefits and a hearing on the matter. (45 C.F.R. § 205.10(a)(4)(iii).) Furthermore, these regulations provide that "assistance shall not be suspended" to those recipients who *78 request a hearing until "[a] determination is made at the hearing that the sole issue is one of State or Federal law or policy, or change in State or Federal law...." (45 C.F.R. § 205.10(a)(6)(i)(A), italics added; § 205.10(a)(6)(i)(C).)
In view of the mandatory language of these regulations, we conclude the Child Welfare Services program falls under Pratt, rather than under Dowling, to the extent determined by the regulations in question.[16] (See Pratt v. Wilson, supra, 770 F.Supp. at p. 544, fn. 14.) Accordingly, the Controller may properly disburse only those funds necessary to comply with the notice-and-hearing requirements imposed by federal regulations on the Child Welfare Services program.
In sum, the preliminary injunction must be reversed to the extent that it bars timely payments under the federal mandates that we have identified regarding the Food Stamp program, the Foster Care and Adoption programs, the Child Support program, and the Child Welfare Services program.[17]

E. Bond

Finally, appellants contend that the trial court failed to require an adequate bond. "On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).) As the court observed in ABBA Rubber Co. v. Seaquist (1991) 235 Cal.App.3d 1, 14, 286 Cal.Rptr. 518, "the trial court's function is to estimate the harmful effect which the injunction is likely to have on the restrained party and to set the undertaking at that sum."
In view of our conclusion that the preliminary injunction must be reversed in part (see pt. II., B, C.I., C.3. D.I., D.2., ante), and Jarvis and White's representation that they do not seek further relief before the trial court, we do not address appellants' contentions on this issue.

DISPOSITION
The appeal in the action initiated by White (B122178) is dismissed as moot. White and respondents in this action shall bear their own costs on appeal.
The preliminary injunction in the action initiated by Jarvis and White (B123992) is reversed to the extent that it bars the Controller from disbursing funds pursuant to (1) continuing appropriations, (2) article III, section 4, and article XVI, section 8.5, of the state Constitution, (3) the Federal *79 Labor Standards Act (29 U.S.C. § 201 et seq.), and (4) the federal funding mandates that we have identified applicable to the Food Stamp program (7 U.S.C. § 2011 et seq.), Foster Care and Adoption programs (42 U.S.C. § 670 et seq.), Child Support program (42 U.S.C. §§ 651-669b), and Child Welfare Services program (42 U.S.C. §§ 620-628). The preliminary injunction is otherwise affirmed. In view of Jarvis and White's abandonment of further action in the trial court, we do not remand the matter for modification of the preliminary injunction. Appellants in the action initiated by Jarvis and White are awarded their costs on appeal. The writ of supersedeas will remain in effect until the issuance of our remittitur.
The petitions for writ of mandate (B124395, B124397, B124398) are dismissed as moot. Petitioners are awarded their costs regarding these petitions.
We concur: EPSTEIN, Acting P.J., and HASTINGS, J.
NOTES
[*] Connell v. Superior Court (B124395); California State Employees Assn. v. Superior Court (B124397); California Correctional Peace Officers Assn. v. Superior Court (B124398).
[1] Our conclusions here are limited to the provisions of law addressed by the parties on appeal. We do not assess whether other provisions of law may authorize or mandate the disbursement of funds during a budget impasse.
[2] On October 8, 1997, the trial court granted Gary Gavinski and California State Employees Association, Service Employees International Union, Local 1000, AFL-CIO, CLC (CSEA) leave to intervene in the action.
[3] These state employees, unions, and professional associations are as follows: Tim Behrens, David K. Okumara, Joseph W. Jimenez, CSEA, Professional Engineers in California Government, California Association of Professional Scientists, California Correctional Peace Officers Association, and California Union of Safety Employees.
[4] After Feitelberg and Alameda Drug Company filed their respondents' brief in the appeal arising from the Jarvis action, they dismissed their complaint in intervention before the trial court, and indicated that they would not participate as respondents in the appeal.
[5] Because the petitions for writ of mandate assert contentions raised in the appeal in the second action by the Controller and the state employee interveners, we do not separately address these petitions.
[6] The Controller's opening brief contends that numerous statutes and voter-approved laws establish continuing appropriations independent of the budget act, but she does not fully enumerate them. As a "small sampling," the Controller cites statutes enacted by the Legislature, including purported appropriations for disability insurance payments (Unemp.Ins.Code, § 3012), income tax refunds (Rev. & Tax.Code, § 19611), the Local Revenue Fund (Welf. & Inst.Code, § 17600), the Local Public Safety Account (Gov.Code, § 30052, subd. (a)), contributions to the Teachers' Retirement Fund (Ed.Code, § 22955), retirement and disability payments (Ed.Code, § 22307), the operations of California Housing and Infrastructure Finance Agency (Health & Saf.Code, §§ 51000, 50154), the Local Agency Investment Fund (Gov.Code, § 16429.1), and bond-related payments (Gov. Code, §§ 15814.16, 15848). The Controller also points to general obligation bond acts (e.g., Gov.Code, § 8879.10, Pub.Util.Code, § 99693.5, Pen.Code, § 7428) approved by the voters pursuant to article XVI, section 1 of the state Constitution.

For the reasons explained in the text, we do not address whether any of these laws, taken individually, establish continuing appropriations independent of the budget act.
[7] Government Code section 16304 provides: "An appropriation shall be available for encumbrance during the period specified therein, or, if not otherwise limited by law, for three years after the date upon which it first became available for encumbrance. An appropriation containing the term `without regard to fiscal years' shall be available for encumbrance from year to year until expended. [¶] An appropriation shall be deemed to be encumbered at the time and to the extent that a valid obligation against the appropriation is created."

Government Code section 16304 further provides that some appropriations are exempt from these limitations and are "available from year to year until expended," including "[c]ontinuing provisions of law appropriating for specific purposes certain classes of revenue or other receipts, upon their deposit in a particular fund in the State Treasury or upon their collection by an agency of this state." (Id., subd. (f).)
Government Code section 13340 provides that with enumerated exceptions, "no moneys in any fund that, by any statute other than a Budget Act, is continuously appropriated without regard to fiscal years, may be encumbered unless the Legislature, by statute, specifies that the moneys in the fund are appropriated for encumbrance." (Id., subd. (a).)
[8] The formulas, as set forth in subdivision (b) of article XVI, section 8 of the California Constitution, are as follows: "(1) The amount which, as a percentage of General Fund revenues which may be appropriated pursuant to Article XIII B, equals the percentage of General Fund revenues appropriated for school districts and community college districts, respectively, in fiscal year 1986-87.[¶] (2) The amount required to ensure that the total allocations to school districts and community college districts from General Fund proceeds of taxes appropriated pursuant to Article XIII B and allocated local proceeds of taxes shall not be less than the total amount from these sources in the prior fiscal year, excluding any revenues allocated pursuant to subdivision (a) of Section 8.5, adjusted for changes in enrollment and adjusted for the change in the cost of living pursuant to paragraph (1) of subdivision (e) of Section 8 of Article XIII B. This paragraph shall be operative only in a fiscal year in which the percentage growth in California per capita personal income is less than or equal to the percentage growth in per capita General Fund revenues plus one half of one percent. [¶] (3)(A) The amount required to ensure that the total allocations to school districts and community college districts from General Fund proceeds of taxes appropriated pursuant to Article XIII B and allocated local proceeds of taxes shall equal the total amount from these sources in the prior fiscal year, excluding any revenues allocated pursuant to subdivision (a) of Section 8.5, adjusted for changes in enrollment and adjusted for the change in per capita General Fund revenues. [¶] (B) In addition, an amount equal to one-half of one percent times the prior year total allocations to school districts and community colleges from General Fund proceeds of taxes appropriated pursuant to Article XIII B and allocated local proceeds of taxes, excluding any revenues allocated pursuant to subdivision (a) of Section 8.5, adjusted for changes in enrollment. [¶] (C) This paragraph (3) shall be operative only in a fiscal year in which the percentage growth in California per capita personal income in a fiscal year is greater than the percentage growth in per capita General Fund revenues plus one half of one percent."
[9] We do not resolve the extent to which the FLSA applies to the different categories and classes of state employees, or the extent to which the compensation required under the FLSA may fall short of any state employee's full salary. These questions have not been presented to us, and we do not address them.
[10] We recognize that individuals cannot initiate actions under the FLSA against states that have not waived their immunity under the Eleventh Amendment to the United States Constitution (Alden v. Maine (1999) 527 U.S. 706, 754, 119 S.Ct. 2240, 144 L.Ed.2d 636), and that California has not waived this immunity (Baird v. Kessler (E.D.Cal.2001) 172 F.Supp.2d 1305, 1312). Nonetheless, the FLSA authorizes the Secretary of Labor to seek the payment of minimum wages and overtime compensation "owing to any employee or employees" under the FLSA (29 U.S.C. § 216(c)).
[11] Citing American Federation of Government Employees v. Rivlin (D.D.C. Nov. 17, 1995, No. 95-2115) 1995 WL 697236, Jarvis and White disagree, pointing out that despite the FLSA, many federal employees were laid off during the 1985 federal budget impasse pursuant to article I, section 9, clause 7 of the United States Constitution, which provides that "[n]o money shall be drawn from the Treasury but in consequence of appropriations made by law," and other federal employees were compelled to work without pay. However, American Federation of Government Employees provides little guidance here. The United States Constitution, unlike the California Constitution, is not governed by federal statutory law such as the FLSA. (Marbury v. Madison (1803) 5 U.S. (1 Cranch) 137, 176-177, 2 L.Ed. 60.)
[12] Citing Donovan v. Crisostomo (9th Cir. 1982) 689 F.2d 869, 876, the state employee interveners argue under the FLSA, employees who work overtime must receive the requisite overtime wages plus their full straight time pay. However, they do not cite any authority that the FLSA requires the full payment of straight time wages in all circumstances, and we are unaware of any such authority.
[13] On a related matter, the Controller argued before the trial court that wage payments for state employees adjusted to the federally mandated levels could not be issued by the pending pay date, and that an injunction ordering such an adjustment therefore threatened injury to state employees and the imposition of penalties on California for violations of the FLSA. Because the trial court concluded that the FLSA did not apply to state employees who continued to work after the date of the injunction, it did not resolve the factual issues raised by this contention.

We decline to resolve these factual issues for the first time on appeal. Under the FLSA, penalties may be excused when the employer engages in good faith conduct that violates the FLSA (Craig v. Far West Engineering Co. (9th Cir.1959) 265 F.2d 251, 261; Nash v. Resources, Inc. (D.Or.1997) 982 F.Supp. 1427, 1436), including conduct in compliance with a governmental directive (Reed v. Murphy (5th Cir.1956) 232 F.2d 668, 677). In view of this fact, as well as the Controller's scanty evidentiary showing, the record permits conflicting inferences regarding the likelihood of penalties and the extent of financial injury to state employees. Under these circumstances, it is inappropriate for us to resolve the pertinent factual issues. (Crocker Nat. Bank v. Emerald (1990) 221 Cal.App.3d 852, 865, [270 Cal. Rptr. 699].)
[14] "[I]n August 1996, Congress enacted a new federal welfare law, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (`PRWORA'), 42 U.S.C. §§ 601, et seq.,.... The PRWORA superceded the AFDC program with a new program entitled Temporary Assistance of Need[y] Families (`TANF') that significantly increased the states' discretion to design their federally supported welfare plans...." (Roe v. Anderson (9th Cir.1998) 134 F.3d 1400, 1403, fn. 3.)
[15] We observe that the statute the Controller cites for this proposition (42 U.S.C. § 625(a)(2)) states nothing about the carryover of former AFDC payment requirements. Title 42 of the United States Code section 625(a)(2) provides only that enumerated funds disbursed under the Foster Care and Adoption programs "shall be deemed to have been expended for child welfare services." Taken by itself, this provision does not imply that the Welfare and Services program, insofar as it exists independently of the Foster Care and Adoption programs, is subject to timely payment requirements, including those applicable to the latter program.
[16] We note that these regulations also apply to the Foster Care and Adoption programs (45 C.F.R. § 1355.30(p)), and thus they constitute a mandate for disbursing funds in connection with these programs, over and above the provisions of law that are cited above in the text.
[17] Jarvis and White disagree regarding the latter three programs, citing section 901 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Pub.L. No. 104-193 (Aug. 22, 1996) 110 Stat. 2105). This provision states that TANF funds received by a state under part A of title IV of the Social Security Act (42 U.S.C. § 601 et seq.), as well as funds received under the Child Care and Development Block Act of 1990, "shall be subject to appropriation by the State legislature, consistent with the terms and conditions required under such provisions of law." However, the three programs in question are established and receive funds pursuant to other federal statutes (respectively, parts E (42 U.S.C. § 670 et seq.), D (42 U.S.C. § 651-669b), and B (42 U.S.C. § 620-628) of title IV of the Social Security Act), and nothing in the provision cited by Jarvis and White displaces the federal mandates that we have identified in the text.